ELBERT TAYLOR v. THE STATE.

No. 4944.   Decided May 12, 1920.

### 1.—Murder—Circumstantial Evidence—Sufficiency of the Evidence.

While it is true that to sustain a verdict based upon circumstantial evidence alone, each fact necessary to a conviction must be established by competent evidence beyond a reasonable doubt, yet the jury being judge of the facts proved, the weight to be given the testimony, and the credibility of the witnesses, their finding as to the existence of a given fact is not to be overturned for the reason that it is supported by conflicting evidence, or by witnesses against whom there has been introduced discrediting testimony, and in the instant case the conviction will not be disturbed.

### 2.—Same—Rules Stated—Practice on Appeal.

While this court has the right to reverse a judgment of conviction on account of the insufficiency of the evidence, and it becomes its duty to do so if the guilt of the accused is not made to appear with reasonable certainty, yet no fixed rule as to this can be devised, and each case must be tested by its own facts. Following Mitchell v. State, 33 Texas Crim. Rep., 577, and other cases. But, when a jury reaches the conclusion upon evidence properly before them that the accused is guilty, their verdict cannot be supplanted by the reviewing court, unless it is able to point to weaknesses which destroys its cogency.

### 3.—Same—Rules Stated—Circumstantial Evidence.

The law does not require that each fact proved, standing alone, be of such weight as to establish guilt; the facts must be measured in their relation to each other, and it is the combined force of the consistent facts upon which the verdict rests. Following Parish v. State, 83 Texas Crim. Rep., 75; and other cases. Distinguishing Wilkie v. State, 83 Texas Crim. Rep., 490.

### 4.—Same—Evidence—Written Statements—Grand Jury.

There was no error in refusing to sustain defendant's motion to require the district attorney to deliver certain alleged written statements in his possession, consisting of the testimony of some of the witnesses in the case delivered before the grand jury, as these were not public documents. Distinguishing Jenkins v. State, 45 Texas Crim. Rep., 176.

### 5.—Same—Evidence—Imputing Crime to Another.

Where, upon trial of murder, defendant sought to introduce testimony imputing the crime to another, but it appeared from the qualification of the bill of exceptions of the refusal of testimony, to the effect that shortly before the deceased was killed there were a number of people living in the community who had trouble with him, and there was no effort made to name the persons inquired about, the locality of their residence and their whereabouts on the day of the homicide, there was no reversible error. Distinguishing Dubose v. State, 10 Texas Crim. App., 246, and other cases.

### 6.—Same—Rules Stated—Imputing Crime to Another.

The rule is now well established that evidence which merely shows some animus or hostility of some third person against the deceased, and no proximate connection with the killing, will not be admitted. Following Porch v. State, 50 Texas Crim. Rep., 337, and other cases.

### 7.—Same—Evidence—Hearsay Testimony.

The proposed testimony, whereby the defendant offered to prove that a certain person claimed that the deceased had tried to waylay him and kill him, was properly excluded, as said person was available as a witness.

### 8.—Same—Evidence—Declaration of Third Parties.

The declarations of the wife of the deceased made sometime before his death, that she had left home because of mistreatment by her husband, was properly rejected as hearsay, as her testimony was also available.

### 9.—Same—Evidence—Acts of Defendant—Tracks—Comparison.

There was no error in admitting testimony by the sheriff that, after he arrested defendant, and without warning him, he received from him a pair of shoes which the sheriff subsequently used in comparison with certain tracks found about the scene of the homicide, and this was no infringement of the statutory rule against the receipt of a confession from one who is under arrest and unwarned. Following Thompson v. State, 55 Texas Crim. Rep., 120 and other cases.

### 10.—Same—Evidence—Cross-examination—Declarations of Defendant.

Where, upon trial of murder, defendant testified that at the time of the homicide he was wearing boots, and the State on cross-examination proved

by him that he might have said on a previous trial that on Wednesday after the killing he had stated that he did not remember whether he had on boots or shoes on the day the deceased was killed, there was no error, as this did not infringe upon the rule of testifying under arrest without warning; defendant having voluntarily testified on a former trial to these facts. Following Collins v. State, 46 S. W. Rep., 935.

**11.—Same—Evidence—Declarations of Defendant—Supporting Testimony.**

Where certain witnesses for the State had detailed a conversation between defendant and others at which time certain cartridges were obtained and defendant's gun loaded with them, and defendant on cross-examination laid a predicate to impeach these witnesses by contradictory testimony at the examining trial, and upon their denial introduced the same, there was no error in permitting the State to introduce supporting testimony of these witnesses by statements made by them before the examining trial and consistent with the testimony on the trial of the case. Following Bailey v. State, 9 Texas Crim. App., 99, and other cases.

**12.—Same—Evidence—Supporting Testimony.**

Where, defendant made an effort to impeach a State's witness by showing that his testimony given at the examining trial was not in harmony with that given by him upon the second trial of the case, there was no error in permitting the State to introduce sustaining testimony given by the witness upon the first trial of the case following the examining trial.

**13.—Same—Lapse of Time—Rules Stated.**

This court has been referred to no instance in which the court has held that the lapse of time was the test of the admissibility of such supporting testimony, but instances have been cited in which the sustaining evidence related to conversations or statements made by the witness subsequent to the impeaching statement. Following Baldwin v. State, 199 S. W. Rep., 468, and other cases.

**14.—Same—Evidence—Declarations of Third Party—Credibility of Witness.**

Where defendant's mother appeared as a witness for him and testified that at the time of the homicide her son was wearing boots and not shoes, there was no error in permitting the State, on her cross-examination, to show that in her testimony given at the *habeas corpus* hearing she did not make any statement that defendant was wearing boots, and must have known that the State expected to prove that he had worn a pair of shoes at the time of the killing, and that these shoes had been obtained from him and fitted into certain tracks found near the scene of the homicide.

**15.—Same—Jury and Jury Law—Special Venire.**

Where, upon trial of murder in a county not included in the jury wheel law, there had been selected by the jury commissioners certain persons to serve as petit jurors for each of the four weeks of the term, and each of these names were written upon a separate slip of paper, placed in a box, and there were drawn therefrom one hundred and sixty names which were placed upon the list and furnished to the sheriff, in connection with the special venire lists, and summoned by the sheriff to serve as the special venire in defendant's case, there was no error in overruling defendant's motion objecting to this procedure on the ground that it was unauthorized by law.

**16.—Same—Jury and Jury Law—Special Venire—Codification.**

In the revision of the Code in 1911, Article 647, C. C. P., as amended was brought forward as Article 660, while Article 647, as it previously existed is omitted from the code, and the effect of this procedure was to repeal the provisions of the older Article 647 and substitute therefor the new provisions thereof now embodied in Section 660, C. C. P.; but the amended section of Article 660 is effective only in those counties in which the jury wheel is in vogue, and such jury wheel not being in use in the county in which the trial took place, the selection of the jury was authorized under other articles of the statutes, and there was no reversible error.

**17.—Same—Rules Stated—Trial by Jury—Inherent Power.**

The right of trial by jury is guaranteed by the Constitution, and the Legislature given power to pass such laws as may be needed to regulate the same and maintain its purity and efficiency, and the jurisdiction to try felony cases having been conferred by the Constitution upon the District Courts, they are not without power to organize the jury and comply with the mandates of the Constitution, but they must follow the procedure designated by the Legislature, and in the absence of such procedure supply the omission.

**18.—Same—Case Stated—Jury and Jury Law—Statutes Construed.**

Articles 658, 659, 661, 661a, C. C. P., and other civil statutes fully supply the authority to the court for ordering the special venire drawn from the list prepared by the jury commissioners.

**19.—Same—Rehearing—Function of Jury—Practice on Appeal.**

This court declines to interfere with the verdict of a jury when the evidence is conflicting, and only acts in such matters when the record is so bare of supporting facts as to lead it to conclude that the result must have come through some passion or prejudice, or, when the verdict is such as that a reasonable mind is unable to assent to the conclusion reached by the jury, which is not so in the instant case, and the verdict of conviction will not be disturbed.

**20.—Same—Special Venire—Rules of Common Law—Open Venire.**

Where, appellant contended on motion for rehearing, that there should have been an open venire, as in the Common Law practice, the matter may be disposed of by saying that the right to a special venire in a capital case arises wholly by statute, and no such procedure was known to the Common Law.

**21.—Same—Jury Commissioners—Special Venire—Statutes Construed.**

The provisions of our statutes regarding jury commissioners and fixing their duties when selecting men to act as jurors during the entire term of court were not affected as to counties having no city of twenty thousand population, by the jury wheel law, and numerous specific statutes being in force at the time of this trial giving to both the State and the defendant the right to special venire, there was no error in the court's mode of selection of the special venire in the instant case.

**22.—Same—Evidence—Declaration of Defendant—Cross-examination.**

Where, upon trial of murder, defendant testified that he wore boots on the day of the homicide, there was no error in permitting the State, upon cross-examination, to ask him if on a former trial of this case he did not

state, in response to a question by his own counsel, that he had told the sheriff, when arrested, that he did not remember whether he had on boots or shoes on the day of the killing, and to permit him to answer that he might have so testified. Following Rippy v. State, 86 Texas Crim. Rep., 539; 219 S. W. Rep., 463, and other cases.

### 23.—Same—Evidence—Supporting Testimony.

Where, upon trial of murder, a State's witness testified as to a conversation between defendant and his brother which took place a short time before the homicide at sundown, and defendant strongly attacked the testimony of this witness, by showing that on a former *habeas corpus* trial said witness fixed the conversation earlier in the day, there was no error in permitting the State to introduce the testimony of said witness which he gave upon the first trial of this case, wherein he stated that the conversation occurred about sundown. Following White v. State, 42 Texas Crim. Rep., 567. and other cases.

### 24.—Same—Rules Stated—Supporting Testimony—Subsequent Statements.

The question involved in every case like this is the truth of the present narrative given by the witness on the instant trial. As affecting this question the court permits the opposing party to show inconsistent statements made by the witness at other times, and allows the witness so attacked to be supported by testimony of consistent statements, and the question of time is only material as affecting the weight of the testimony, and the statements are not confined to those made prior to the day fixed by the impeaching witness, or witnesses, but such support may be by subsequent, consistent statements also.

### 25.—Same—Evidence—Bill of Exceptions.

This court is not informed by defendant's bill of exceptions in the record whether appellant's mother was asked on the *habeas corpus* trial as to whether defendant wore boots or shoes, nor what her answer was at that time, and so the bill would not disclose error; besides, the question asked the witness with reference to this matter was not reversible error.

### 26.—Same—Imputing Crime to Another.

Where, upon trial of murder, defendant made an effort to show that the crime might have been committed by others, there was no error in rejecting testimony that there were other people in the neighborhood who were on bad terms with the deceased, and with whom he had had trouble.

Appeal from the District Court of Caldwell. Tried below before the Honorable M. C. Jeffrey.

Appeal from a conviction of murder; penalty, ten years imprisonment in the penitentiary.

The opinion states the case.

*C. F. Richards, J. L. Story,* and *Will G. Barber,* for appellant.— On question of insufficiency of the evidence: Wilkie v. State, 203 S. W. Rep., 1091; Walker v. State, 14 Texas Crim. App., 609; Barnell v. State, 5 id., 113; Tollett v. State, 44 Texas, 95; Mitchell v. State, 33 Texas Crim. Rep., 575; Warren v. State, 52 Texas Crim Rep., 218; People v. Doneburg, 64 N. Y. Supreme, 444.

On question of imputing crime to another: Harrison v. State, 83 S. W. Rep., 702; Blocker v. State, 114 S. W. Rep., 816; Dubose v. State, 10 Texas Crim. App., 251.

On question of declarations of defendant while under arrest: Payne v. State, 18 Texas, 60; Davis v. State, 2 Texas Crim. App., 607; Walker v. State, 29 Texas Crim. App., 112; Carter v. State, 23 id., 511.

On question of admitting testimony: Hyden v. State, 31 Texas Crim. Rep., 401; Lewis v. State, 15 Texas Crim. App., 661.

On question of supporting testimony: Conrad v. Griffith, 52 U. S., 489, and cases cited in opinion.

*E. B. Hendricks*, Assistant Attorney General, *J. B. Hatchett* and *E. B. Coopwood*, for the State.—On question of sufficiency of the evidence: Martin v. State, 182 S. W. Rep., 1119; Rose v. State, 186 S. W. Rep., 202; Fritz v. State, 188 S. W. Rep., 978; Gomez v. State, 188 S. W. Rep., 991; Warbington v. State, 189 S. W. Rep., 147.

MORROW, JUDGE.—Appeal is from conviction for murder. Punishment was fixed at confinement in the penitentiary for ten years.

There is evidence in the record that for some time prior to the tragedy the deceased and appellant were not on friendly terms; that on the afternoon of the day of the homicide, the deceased cast reflections upon the Taylor name, resulting in a difficulty between him and Hugh Taylor, the appellant's cousin—both were on horseback, and the deceased chased Hugh Taylor, whereupon the appellant, who was present, went to his cousin's house for the express purpose of getting a gun to use in aiding his cousin in his conflict with deceased—that failing to get the gun he went to the store of his uncle where he had previously left his own shotgun, and secured it and at the same time some shells loaded with buckshot. The deceased lived on a public road about half a mile East of Taylor's store; on the same road near the store lived Ivan Taylor, the appellant's brother, and about midway between lived the appellant. The deceased had a field or pasture on the opposite side of the road at a point West of appellat's house and East of Ivan Taylor's house, and the father of appellant lived Southwest from appellant's house about 500 yards. It was shown that after obtaining the gun and shells, and loading the gun, appellant and his brother left the store at the same time, appellant on horseback and Ivan on foot; and that shortly before their departure appellant said to Ivan: "Don't shoot too low." The deceased kept his milk cows in his field or pasture mentioned, and his custom—known to appellant—was to turn them out of the pasture late in the evening. When appellant left the store he rode first to his brother Ivan's home, departing from the road which led to his own house, he went to his father's and from thence to his own home, his theory and the testimony of himself and his wife tending to

show that he reached his home before the homicide and remained there until after it took place, leaving the horse which he was riding in his lot. A witness named Stevens, traveling towards Taylor's store in his buggy, passed the home of deceased and stated that about that time he heard a shot fired, and saw the wife of deceased milking, she having turned part of the cows in the lot and the others were standing in the lane, and that on going by the field or pasture of deceased this witness saw the horse of deceased bridled and saddled and loose, without a rider, and about the same time saw a man some distance away passing through the field or pasture, in which there was some undergrowth. The witness did not recognize the man he saw, though he took it to be the deceased. The man was wearing a coat, however, such as that worn by the appellant. The appellant and his wife claimed that at the time Stevens passed appellant's house appellant was standing in the lot, and that Stevens was seen by them, though Stevens disclaimed seeing anyone at the appellant's house at the time. The shot was fired near sundown, and the deceased was killed by a load of buckshot fired from a shotgun, entering his head. Two or three days after the homicide tracks were found in the field or pasture, some of them coinciding with the place where the man was seen by Stevens, and some other places near where the deceased was killed, in which tracks the shoes, which were obtained by the sheriff from the appellant after the homicide, were fitted. The appellant testified at the trial that he was wearing boots at the time of the homicide, and so did his wife and mother. There were indications on the ground tending to show that the shot was fired from ambush. Some of these facts were uncontroverted, some established by conflicting evidence, and some by the testimony of witnesses whom the appellant sought to impeach by evidence that they had made contradictory statements.

It is true that to sustain a verdict based upon circumstantial evidence alone, each fact necessary to a conviction must be established by competent evidence beyond a reasonable doubt, but the jury, being judge of the facts proved, weight to be given the testimony, and the credibility of the witnesses, their finding as to the existence of a given fact is not to be overturned for the reason that it is supported by conflicting evidence or by witnesses against whom there has been introduced discrediting testimony. Texas Code of Criminal Procedure, Art. 786; Vernon's Criminal Statutes, vol. 2, 687. We cannot, therefore, sustain the appellant's contention that the evidence is insufficient because it is in part conflicting and in part the testimony of witnesses whose credibility has been assailed.

On the contrary, we must assume, in passing upon the sufficiency of the evidence, that questions involving the credibility of witnesses and conflicting testimony have been determined in favor of the State. Vernon's Texas Crim. Statutes, vol. 2, p. 690, cases in note 17-18. While this court has the right to reverse a judgment of conviction on

account of the insufficency of the evdence, (Texas Code Crim. Procedure, Art. 939) and it becomes its duty to do so "if the guilt of the accused is not made to appear with reasonable certainty" (Mitchell v. State, 33 Texas Crim. App., 577), no fixed rule has been devised which will in all cases furnish a certain standard. Necessarily each case must in a measure be tested by its own facts. Mitchell v. State, 33 Texas Crim. App., 577; Hampton v. State, 1 Texas App., 652; Burrill on Circumstantial Evidence, p. 737; Wills on Circumstantial Evidence, p. 188. However, when a jury, advised of the restrictions which the law places upon them in condemning one on circumstantial evidence, reaches the conclusion upon evidence properly before them that the accused is guilty, it is not for the reviewing court to supplant their findings by its own, unless it is able to point to weaknesses, omissions, or inconsistencies in the evidence which destroy its cogency.

This, in the instant case, we are unable to do.

In addition to his attack on the sufficiency of the evidence because of contradictions and impeachment, he urges that the proof with reference to tracks does not exclude the theory that they were made by another; that the witness who saw a man near the place of the homicide did not identify appellant as the man he saw; and points out what he regards as similar element of weakness in some other parts of the testimony. The evidence upon these matters was, in our judgment, consistent with the guilt of appellant, and not inconsistent with his innocence. The law does not require that each fact proved standing alone be of such weight as to establish guilt. Vernon's Texas Crim. Statutes, vol. 2, p. 595; Marshall v. State, 5 Texas App., 373; Crass v. State, 30 Texas App., 480. The facts must be measured in their relation to each other. It is the combined force of the consistent facts upon which the verdict rests. Hocker v. State, 34 Texas Crim. App., 359; Parish v. State, 85 Texas Crim. Rep., 75, 209 S. W. Rep., 670.

In Porch's Case, 50 Texas Crim. App., 337, a conviction for murder was sustained upon evidence quite similar to that in the case in hand. Appellant refers to Wilkie's case, 83 Texas Crim. Rep., 490, 203 S. W. Rep., 1091, as furnishing a precedent controlling in his favor the decision of this case. We do not think so. It is illustrative of the view hereinbefore expressed—that in testing the sufficiency of the evidence, the facts of the particular case are controlling. The principle there applied was a well established one, namely, that in a case of circumstantial evidence where the testimony disclosed that there was available to the State pertinent and important evidence which was not introduced, that the reasonable presumptions that arise therefrom are considered in favor of the accused. The court in deciding that case regarded certain evidence, which was available to the State and which was not introduced, as affording a presumption so inconsistent with some of the main facts relied upon by the State that the cogency of the evidence upon which the conviction rested was de-

stroyed. So far as the principle obtains in the instant case, it arises from the suggestion by the evidence that there were others who had motive and opportunity to commit the offense, and the existence of the hypothesis that it was committed by them and not by the appellant. In this case, the theory was met by evidence which was regarded by the jury as eliminating the theory that the homicide was committed by any other than the appellant.

The court was not in error in refusing to sustain appellant's motion to require the district attorney to deliver certain alleged written statements in his possession, consisting of the testimony of some of the witnesses in the case delivered before the grand jury and therein reduced to writing and signed by them. These were not public documents as were those involved in Jenkins v. State, 45 Texas Crim. App., 176. See Goode v. State, 57 Texas Crim. App., 228. The statute limits the use to be made of evidence given before the grand jury. Vernon's Code of Crim. Procedure, Art. 416; Christian v. State, 40 Texas Crim. App., 671. On the subject, Mr. Wharton, in his work on Criminal Evidence, Sec. 564a, says: ''The general rule is that an accused in a criminal case has no right to an inspection of the minutes of the grand jury returning the indictment against him, either before or during the trial, but this is a matter resting in the discretion of the court, and, where some special reason exists, such as to enable the accused to properly move to set aside the indictment, he may be permitted to inspect the minutes of the proceedings.'' See also Thompson on Trials, page 2096; American and English Encyclopedia of Law, vol. 17, p. 1291.

The motion does not specify the names of the witnesses nor the substance of their testimony, nor is there any suggestion that the documents in question were used on the trial against the appellant so as to make them available to him for the purpose of cross-examination. Under the rule recognized in Green v. State, 53 Texas Crim. App., 491; 22 L. R. A., New Series, 707.

The appellant sought to introduce testimony of a witness to the effect ''that at and shortly before the time Chamberlain was killed there were a number of other people living in that neighborhood who were on bad terms with said Chamberlain, and who had had trouble with him.'' It appears from the qualification that there was no effort by appellant's counsel to name the persons inquired about, the locality of their residence, and their whereabouts on the day of the homicide. The same question of law involved in this inquiry was decided against appellant upon former appeal of this case, upon the authority of Wallace v. State, 46 Texas Crim. App., 349; McCorquodale v. State, 54 Texas Crim. App., 344; Ogden v. State, 58 S. W. Rep., 1018; Brown v. State, 74 Texas Crim. App., 356. The leading case relied upon by the appellant supporting the proposition that there was error in excluding the testimony referred to is Dubose v. State, 10 Texas App., 246. The point there in question is thus stated

in the opinion: "One Bacquet was a very important, in fact, the main' witness for the State. Besides his evidence there is no fact tending to produce anything more than a bare suspicion against the defendant. The record contains some evidence inculpating this witness. The defendant offered other evidence upon the trial, tending to connect this witness with the murder. This evidence consisted of motive, threats and opportunity to kill the deceased Benton. To the introduction of these facts the State objected, and the court below sustained the objection; to which ruling the defendant excepted and reserved his bill of exceptions."

It is to be noted that in the Dubose case the proffered evidence related to a specific person, and the evidence excluded consisted of "motive, threats, and opportunity to kill." To the admissibility of such evidence we firmly adhere. We reversed this case on a former appeal because the trial court had rejected evidence of this character. Taylor v. State, 81 Texas Crim. Rep., 359, 195 S. W. Rep., 1147. On the present trial, following the decision of a former appeal, the court admitted proof that members of the Fisher family and others entertained ill-will against the deceased, and that they were within such proximity to the homicide as to present a reasonable hypothesis that they or some of them were responsible for the crime. The evidence, a rejection of which is now complained of, was wholly indefinite. Touching the subject in Harrison v. State, 47 Texas Crim. Rep., 393, relied upon by appellant, the following is said: "The rule is now well established that evidence which merely shows some animus or hostility of some third person against the deceased, and no proximate connection with the killing, will not be admitted."

That such evidence is remote to a degree that it is of no weight is the opinion expressed not only by the learned judges of this court in former days, but by many in other jurisdictions. It rests, like other rules of evidence not statutory, upon the opinion of many jurists, often expressed in their solemn decisions. The rules of circumstantial evidence do not require that the circumstances should to a moral certainty actually exclude every hypothesis that the act may have been committed by another person, but the hypothesis intended is a reasonable one consistent with the circumstances and facts proved, and the supposition that the act may have been committed by another person must not be out of harmony with the evidence. Schultz v. State, 13 Texas, 401; Hamlin v. State, 39 Texas Crim. App., 606; Porch v. State, 50 Texas Crim. App., 335. The fact that a witness was willing to state that some other person, unnamed, unidentified, and whose whereabouts at the time of the homicide there was no offer to prove, entertained ill-will towards the deceased, afforded no reasonable hypothesis accounting for his death.

The proposed evidence whereby the appellant offered to prove by the witness McMahan that a person named Fisher claimed that Chamberlain had tried to waylay and kill him was, we think, properly re-

jected as hearsay. Proof was admitted that Fisher and Chamberlain were on unfriendly terms. Fisher was present and available as a witness. If the details of his transactions with deceased were admissible as evidence, his testimony thereto would have been the best evidence. We are also of the opinion that the declaration by Mrs. Chamberlain, the wife of the deceased, made some time before his death, that she had left home because of mistreatment by her husband, was properly rejected under the hearsay rule. Her testimony was available.

We do not think the complaint of the fact that the sheriff testified that after he arrested appellant and without warning him he received from appellant a pair of shoes which he subsequently used in comparison with certain tracks found about the scene of the homicide, shows an infringement on the statutory rule against the receipt of a confession from one who is under arrest and unwarned. The point seems to be decided against the appellant's contention: Walker v. State, 7 Texas App., 245; Thompson v. State, 45 Texas Crim. App., 192; and various cases cited in Rose's Notes on Texas Reports, vol. 5, 50.

The appellant on his trial testified that at the time the homicide took place he was wearing boots. The State on cross-examination proved by him that "he might have said on a previous trial that on Wednesday after the killing he had stated that he did not remember whether he had on boots or shoes on the day Mr. Chamberlain was killed." The admission of this cross-examination is made the basis of complaint upon the ground that it violated the statutory rule against repeating the statement of one accused of crime while under arrest and unwarned. We understand from the bill that on the former trial the sheriff, without objection, testified to a conversation with the appellant touching the shoes that he got from him while he was under arrest and unwarned, and that on that trial while appellant was not under arrest he voluntarily took the stand and made the statement quoted above. We think, he having on the first trial waived any objection to the sheriff's testimony and in his own testimony upon that trial given his explanation of his conversation with the sheriff, that the prosecution was within its rights in reproducing on this trial what the appellant said on the former trial. Branch's Texas Crim. Statutes, sec. 328; Collins v. State, 46 S. W. Rep., 935.

Two witnesses by the name of Stevens gave important testimony for the State in detailing a conversation between appellant and his brother, Ivan Taylor, and between Ivan Taylor and the uncle of the appellant, during which conversation—according to the testimony of these witnesses—certain cartridges were obtained and appellant's gun loaded with them. The appellant on cross-examination laid a predicate to impeach these witnesses by contradictory testimony given by them at the examining trial, and upon their denial that they made

contradictory statements the appellant introduced evidence going to contradict them by showing that their testimony on the examining trial was different from that on the present trial. The State subsequently supported these witnesses by statements made by them before the examining trial and consistent with the testimony given on the trial of the case. While the courts of many jurisdictions reject this character of testimony, those in our jurisdiction have uniformly received it. Bailey v. State, 9 Texas App., 99; Hamilton v. State, 36 Texas Crim. App., 373; White's Texas Code of Criminal Procedure, Sec. 1119, p. 729, sub-division 4; Branch's Annotated Texas Penal Code, Secs. 181 and 182; Cyc. vol. 40; p. 2760. We discern in the instant case no deviation from the rule of evidence prevailing in this State permitting a witness who has been impeached by proof of contradictory statements to be sustained by proof of statements in harmony with those made by him upon the trial, where the sustaining statements are made under circumstances disclosing no motive to state other than the truth.

The same complaint is made of the receipt of testimony from the witness Morris, the bill stressing the fact that the effort to impeach Morris was by showing that his testimony given at the examining trial in June was not in harmony with that given by him upon the second trial of the case, and the sustaining testimony was that given by him upon the first trial of the case following the examining trial in June. The witness on his cross-examination denied making the conflicting statements, and there was developed no interest of his in the case to furnish a motive for changing his testimony between the time he testified on the examining trial in June and that on which he gave his testimony in November. We have been referred to no instances in which the court has held that the lapse of time was the test of the admissibility of such testimony, though our attention has been drawn to a number of cases in which the sustaining evidence related to conversations or statements made by the witness subsequent to the impeaching statements. See Hardin v. State, 57 Texas Crim. Rep., 401, 123 S. W. Rep., 615; Pitts v. State, 60 Texas Crim. Rep., 524, 132 S. W. Rep., 801; Northcut v. State, 70 Texas Crim Rep., 577, 158 S. W. Rep., 1004; Baldwin v. State, 199 S. W. Rep., 468; Franklin v. State, 88 S. W. Rep., 357; Vanhooser v. State, 55 Texas Crim. Rep., 114, 113 S. W. Rep., 285; Johnson v. State, 42 Texas Crim. Rep., 377, 60 S. W. Rep., 48. Our conclusion is that the objection made applies to the weight and not to the admissibility of the evidence.

Appellant's mother, appearing as a witness for him, testified that at the time of the homicide he was wearing boots and not wearing shoes. The State proved by her on cross-examination that in her testimony given at the *habeas corpus* hearing, she did not make any statement to the effect that appellant was wearing boots. This inquiry appears from the bill to have been made and answered with-

out objection. The State then made a further inquiry of the wit-ness, asking her if she did not know at the time she was testifying on the *habeas corpus* trial that the State was contending that her son wore a pair of shoes at the time of the killing, and these shoes had been obtained from him and fitted into certain tracks found near the scene of the killing and that these shoes fitted into the tracks, and that the State expected to make such proof against her son on his trial. She gave an affirmative answer to this inquiry, and it is made the basis of complaint.

It appears from the bill of exceptions that by way of explanation it was shown that the testimony on the *habeas corpus* trial, which only involved the question of bail—which was granted—was, at the request of the judge trying it, made brief, and that there was not a full development of the case. With this before the court, and with-out objection, the fact that Mrs. Taylor had not on the *habeas corpus* hearing mentioned her son's wearing boots, we deem it not improper for the State, as bearing upon the credibility of the testimony that she had given, to show that she at the *habeas corpus* trial understood the importance of proving her son wore boots on the day of the homi-cide. The suggestion in the bill that the question was so framed as to carry to the jury by hearsay the contention of the State at the time of the *habeas corpus* trial, if a just criticism, is not by us re-garded as a material one, for the reason that the accepted qualifica-tion of the bill discloses that the information conveyed by the inquiry related to facts already before the court. From the qualification we quote the following: "The facts showed that on Wednesday after the killing on Friday the sheriff arrested defendant and after his ar-rest procured from him a pair of shoes and compared these shoes with the tracks found going to and from the place of the killing. Be-fore the trial of the *habeas corpus* and before the mother of the de-fendant testified on that trial, the attorneys for defendant and the defendant knew that the sheriff had testified that the defendant had told him that he had on the shoes on the day of the killing, and knew that the sheriff testified that the shoes given him by defendant when compared with the tracks at the place of the killing fitted the tracks exactly."

The court ordered a special venire of 160 men. There had been selected by the jury commissioners persons to serve as petit jurors for each of the four weeks of the term, and each of these names were written upon a separate slip of paper, placed in a box, and there were drawn therefrom 160 names which were placed upon the list and furnished to the sheriff, in connection with a special venire writ, and summoned by the sheriff to serve as the special venire in appel-lant's case. Appellant, by a timely motion, objected to this proced-ure, claiming that it was unauthorized by law.

Prior to the year 1907 there was in the Code of Criminal Proced-ure, Art. 647, which was as follows: "Whenever a special venire is

ordered, all the names of all the persons selected by the jury com-
missioners to do jury service for the term at which such venire is re-
quired shall be placed upon tickets of similar size and color of paper,
and the tickets placed in a box and well shaken up; and from this
box the clerk, in presence of the judge, in open court, shall draw the
number of names required for such special venire, and shall prepare
a list of such names in the order in which they are drawn from the
box, and attach such list to the writ and deliver the same to the
sheriff.''

By the Act of April 18, 1907, an amendment to the jury law was
enacted in which Art. 647 was re-written so that it read as follows:
''Whenever a special venire is ordered the clerk or his deputy, in
the presence and under the direction of the judge, shall draw from
the wheel containing the names of jurors, the number of names re-
quired for such special venire, and shall prepare a list of such names
in the order in which they are drawn from the wheel, and attach
such lists to the writ and deliver the same to the sheriff, and the
cards containing such names shall be sealed up in an envelope and
shall be retained by the clerk for distribution, as herein provided.
If from the names so drawn any of the men are empaneled on the
jury and serve as many as four days, the cards containing the names
of the men so serving shall be put by the clerk, or his deputy, in the
box provided for that purpose, and the cards containing the names of
the men not empaneled shall again be placed by the clerk, or his
deputy, in the wheel containing the names of the eligible jurors.''

In the revision of the Code in 1911, Article 647 as last above quoted
is brought forward as Article 660, while Article 647, as it previously
existed, is omitted from the Code. The appellant rightly contends
that the effect of this procedure was to repeal the provisions of the
old Article 647 and substitute therefor the new provisions thereof
now embodied in Section 660 of the C. C. P. The other provisions of
the act of 1907 render the amended section, Article 660, effective
only in those counties in which the jury wheel is in vogue, and such
wheel not being in use in the county in which the trial took place,
the appellant contends that the special venire in his case was selected
in accord with the terms of and provisions of the statute which was
repealed, and that by reason thereof his motion to quash the venire
writ should have been sustained.

Treating the old Article 647, quoted above, as repealed, there re-
mained in the statute on the subject Article 655, which is as follows:
''A 'special venire' is a writ issued by order of the district court, in
a capital case, commanding the sheriff to summon such a number of
persons, not less than thirty-six, as the court in its discretion may
order.''

Other articles provide that either the State or the accused may se-
cure an order for a special venire. Article 658 provides that the
order shall specify the number of persons to be summoned, and the

time that they shall appear. Article 659 provides for the setting of capital cases. Art. 661 provides: ''Whenever the names of the persons selected by the jury commissioners to do jury service for the term shall have been drawn one time to answer summons to a *venire facias,* then the names of the persons selected by the said commissioners, and which form the special venire list, shall be placed upon tickets of similar size and color of paper, and the tickets placed in a box and well shaken up; and, from this box, the clerk, in the presence of the judge, in open court, shall draw the number of names required for further service and shall prepare a list of such names, in the order in which they are drawn from the box, and attach such list to the writ, and deliver the same to the sheriff; and it shall furthermore be the duty of the clerk and he shall prevent the name of any person from appearing more than twice on all of such lists.''

Art. 661a is as follows: ''Whenever district court shall have convened, and a day shall have been set for the trial of the different capital cases which call for a special venire, the men whose names may have been drawn to answer summons to the venire facias in the different capital cases shall be immediately notified by the sheriff to be in attendance on the court on the day and week for which they were respectively drawn to serve as veniremen for said day and week; and such notice shall be given at least one day prior to the time when such duty is to be performed, exclusive of the day of service.''

This article is also found in the Civil Statutes, 1911, Article 5161. The appointment of jury commissioners, and their oath and qualifications is provided by Title 7, Chapter 1, C. C. P., and by Articles 5135-5136 of the Civil Statutes they are required to select persons to serve as jurors for the week, and to place the names on folded paper in a box and draw therefrom jurors for each week of the term. Other provisions provide that these jurors for the week shall be listed and preserved by the clerk, and it is from such a list that the special venire in the instant case was drawn.

The right of trial by jury is guaranteed by the Constitution, and the Legislature given power to pass such laws as may be needed to regulate the same and maintain its purity and efficiency. Constitution, Art. 1, Sec. 15. The jurisdiction to try felony cases having been conferred by the Constitution upon the District Courts, it follows that they are not without power to organize a jury to comply with the mandate of the Constitution. In organizing a jury, however, they must follow the procedure designated by the Legislature, but in the absence of statutes prescribing the manner in which the jury is to be selected and formed, the trial by jury will not thereby fail, but the courts may supply the omissions. Clawson v. United States, 114 U. S., 477; Lovejoy v. United States, 128 U. S., 173; Green v. State, 53 Texas Crim. Rep., 490; Ruling Case Law, vol. 16, p. 231, Sec. 49.

It is our opinion that the unrepealed statutes referred to furnish authority for ordering the special venire drawn from the list prepared by the jury commissioners. If it be conceded, however, that the repeal of Article 647 left no statutory method for selecting the veniremen, then the method adopted by the court in exerting its inherent power to obtain a venire was not opposed to any law, and it not appearing that it resulted in any injury to appellant, the refusal to quash the writ, was not in error.

Finding in the record no error which would authorize the reversal of the judgment, its affirmance is ordered.

*Affirmed.*

---

ON REHEARING.

May 12, 1920.

LATTIMORE, JUDGE.—Appellant moves for a rehearing, complaining of the insufficiency of the evidence, and of the original opinion of the court in holding that the same fairly supported the verdict.

We decline to interfere with verdicts of juries when the evidence is conflicting, and only act in such matters when the record is so bare of supporting facts as to lead us to conclude that the result must have come through some passion or prejudice, or when the verdict is such as that a reasonable mind is unable to assent to the conclusion reached by the jury. In this case, not only is there a predicate of ill-feeling extending over a time preceding the homicide, but also a fresh provocation on the day thereof, followed by acts of the appellant, and considerable evidence pointing srtongly toward an intention to do harm to the deceased, further supported by evidence which, in our opinion, might lead a dispassionate mind to the conclusion of his guilt.

In addition to the discussion of the testimony had in the original opinion, we call attention to the fact that it was shown that the time of sunset on the day of the homicide was 4:53 P. M.; that witness Everett Stevens says that just before sundown, on his way to Taylor's store, he passed near where the homicide took place, and heard some kind of an explosion; saw the riderless horse of deceased near the fence, on the right side, seemingly excited, and looking from side to side; and that he saw a man walking apparently away from the place where the killing occurred, having on a coat similar in color and appearance to that worn by appellant that afternoon. This witness went on to Taylor's store, where he got his brother and cousin in a few minutes.

Witness Cast saw deceased on horseback just a little before sundown, at a point less than a mile from the place where he was killed, going in that direction in a gallop.

Witness Arthur Gabriel testified that at about 3:30 or 4 o'clock that afternoon, he and Hugh Taylor, who was a cousin of appellant, went to a certain culvert under the road, where they found a number of bottles of whisky, of which they drank freely, and then, taking some of the liquor with them, they went down to Taylor's store, where it seems all parties took several drinks, and that about a half an hour later, witness, appellant, and Hugh Taylor, got on their horses and started back to the said culvert for more whisky; that on their way, they met deceased, who was on horseback. The witness and Hugh Taylor stopped, and appellant who was not on speaking terms with deceased rode fifteen or twenty steps further, and also stopped. Witness asked deceased to have a drink, and handed him a bottle of the whisky, which was branded "Taylor," or "Old Taylor," and deceased took the bottle, but did not drink. He looked at it; said is was good whisky, but had a sorry name, at which Hugh Taylor seemed to take offense, and said that was his name; whereupon, deceased repeated the statement, saying that it was good whisky, but had a sorry name. Hugh protested again at having the Taylor name run down, and deceased then said, "Don't take offense at what I say," or substantially that, and Hugh continued to protest against having his name run down; when deceased reached over and grabbed Hugh, and drew back to hit him, but Hugh pushed him back, and as deceased tried to get at him, Hugh ran off west on his horse. Deceased started after Hugh, but witness Gabriel caught his horse by the bridle, and told him not to pay any attention to what Hugh said, as he was drinking. Deceased told witness to turn the horse loose, and drew the bottle which he had in his hand back as though to strike witness, who then loosed his hold upon the bridle, and deceased went off down the road after Hugh. This witness further said that when he left the spot, appellant was sitting on his horse in the road.

Mrs. Hugh Taylor testified that she lived about a mile from Taylor's Store, and that she was at said store the afternoon of the homicide. and saw appellant bring a shotgun there and leave it with Dick Taylor. She further stated that she left the store about four o'clock, and got home before night; that shortly after she got home, appellant came to her house, and wanted a gun, stating as his reason for wanting it, that deceased had raised a row down there, and had Hugh cut off from home, and that he wanted the gun to help Hugh. Witness did not let him have the gun.

John Gabriel testified that he saw appellant, Hugh Taylor, and the witness's son Arthur, ride by his house on the afternoon of the homicide, going west. Later he saw appellant alone going east toward Taylor's store, in a lope, and that in about twenty or twenty-five

minutes after appellant passed, deceased also passed on horseback, going in the same direction.

Two witnesses named Stevens testified that they were at Taylor's store on the afternoon of the homicide, and that appellant came there and got his shotgun and left. One of the boys said that appellant's brother Ivan, who was there at the time, called for some cartridges, and witness thought he called for buckshot cartridges. After appellant and Ivan left the store, this witness remained until Everett Stevens came to the store in his buggy, and they all left just about sundown; and they say that the time after appellant left, and until Everett Stevens came, would not exceed thirty minutes.

Another witness, named Morris, testified that on the afternoon of the killing, he stayed at Taylor's store until about sundown, and that a short time before sundown he saw appellant and his brother near the corner of said store, talking, and heard appellant say to his brother, "Don't shoot too low." Deceased was killed by buckshot, evidently fired from a shotgun, and was killed somewhere near sundown on Christmas Eve day, 1915. We mention these facts because they seem to place appellant so near, in point of time and place, to the scene of the killing, with a weapon such as actually inflicted the fatal wound, and with evil purpose in his heart toward deceased, which are such cogent facts, in addition to the tracks and other evidence mentioned in the original opinion, as to lead us to conclude that we are not willing to assent to the proposition that this verdict is without evidence to support it. Some of the witnesses were attacked, and former statements testified to somewhat variant from those given on the trial, but these are matters for the jury, which they have settled adversely to appellant.

Objecting to our disposition of his complaint against the method by which the jurors were selected, appellant strongly urges that there was no statutory direction, as he claims, for the selection of the special venire; and that under the provisions of Article 26, Vernon's C. C. P., resort must be had to the rules of the common law, when no statutory provisions appear; that there should have been in this case merely an open venire, addressed to some officer, as is the common-law practice, and that such officer should have been left free to select such jurors as he saw fit. We might dispose of this matter by saying that the right to a special venire in a capital case arises wholly by statute; that no such procedure as a special venire was known to the common law under which a *venire facias* was ordered in any case where the necessity for a jury arose, and no distinction existed between the rule in capital and other felonies, and the officer executing the writ selected and summoned the jury. The provisions of our statute regarding jury commissioners, and fixing their duties when selecting men to act as jurors during the entire term of court, many of which were referred to in the original opinion, were not affected as to counties having no city of 20,000 population, by the jury wheel

law, and we find numerous specific statutes in force at the time of this trial giving to both the State and defendant the right to special venires (Arts. 656-657, Vernon's C. C. P.); directing that the court shall set such capital cases for a particular day (Art. 659, Vernon's C. C. P.); entering an order specifying the number of persons who shall compose the special venire in capital cases (Art. 658, Vernon's C. C. P.); directing that the sheriff shall notify the men whose names had been drawn to answer the summons to the venire in the different capital cases, to be in attendance on the day for which they were drawn, etc. (Art. 661a, Vernon's C. C. P.) It seems difficult to see how it could be contended, in view of these statutory provisions, that there were no statutory rules in such case and that it was proper to resort to common-law methods, which would be in violation of said statutes.

It was very material to show that appellant wore shoes at the time of the homicide, for reasons stated in the original opinion. The sheriff testified that at or about the time he arrested appellant, he got from him a pair of shoes, which he fitted in certain tracks leading up to and away from a point near where deceased was killed, and where there was more or less evidence of an ambush. The record discloses that the shoes were obtained while appellant was under arrest, but he seems to have voluntarily given them to the officers. No conversation had at the time is in the record. Objection was made to this testimony, and it is now again insisted that it was erroneous. We have fully discussed this matter, and held adversely to the contention of appellant in the recent case of Rippey v. State, 86 Texas Crim. Rep., 539, 219 S. W. Rep., 463.

On the instant trial, appellant swore that he wore boots on the day of the homicide. On cross-examination, he was asked if on a former trial of this case, he did not state, in response to a question by his own counsel, that he had told the sheriff, when arrested, that he did not remember whether he had on boots or shoes on the day of the killing. Over objection, he answered that he might have so testified. This seems clearly admissible, under all the rules. If, while on the stand, he had been asked by the State relative to a statement made by him on a former trial, and it was now made to appear that such former statement was a matter not then admissible, and about which he had been compelled, over proper objection, to answer, a different question would have been presented, and we would hold the objection well taken, but it is well settled that the testimony of one accused, given on a former trial, may be reproduced against him, even though at the time he so took the stand, he was in custody and unwarned. See Branch's Ann. P. C., Sec. 80. Such statements made in the voluntary testimony of an accused, even though he be in custody and unwarned, and inadmissible against him on his first trial, or any subsequent trial, as original evidence, become admissible if he volunteers in his testimony, while a witness for himself, a statement embracing

or containing what he said to the officer when arrested. Appellant cites the case of Walker v. State, 28 Texas Crim. App., 112, as by analogy supporting his contention that this question was inadmissible. We cannot agree with same. Judge Willson, in the Walker case, held to be inadmissible, the statement offered as a voluntary statement made by the accused on his examining trial, but the learned judge held that this statement was not made as a voluntary statement, was not authenticated by the magistrate; that the accused was not warned, nor were any statements made by him found to be true.

One Virgil Morris testified for the State as to a conversation between appellant and his brother, which he said took place near sundown on the day of the homicide. Appellant strongly attacked this witness by testimony to the effect that on a *habeas corpus* trial held in June, 1916, and also in a conversation had about the time of the examining trial, held probably in January of the same year, said witness made statements fixing the time of the conversation between appellant and his brother as earlier in the day. To sustain said witness, the State offered the testimony he gave upon the first trial of this case in November, 1916, and also a written statement made by the witness in February, 1919, wherein on both occasions he stated that the said conversation occurred about sundown. The appellant objected to the consistent statement made by the witness in November, 1916, upon the ground that it was an attempt to sustain the witness by proof of a consistent statement made by him after the date of the impeaching statement. In White v. State, 42 Texas Crim. Rep., 567, this Court held admissible a consistent statement made one day after the date of the impeaching statement, no corruptive influence appearing to have approached the witness in the interim. See Hudson v. State, 49 Texas Crim. Rep., 24, 90 S. W. Rep., 177; Brookbank v. State, 55 Ind., 169; State v. Hendricks, 32 Kansas 559.

Appellant cites a number of authorities, all of which we have examined, among them being Elliott v. Pearl, 10 Peters 412 and Conrad v. Griffey, 52 U. S., 480. We have the most profound respect for the court rendering these opinions, but observe that it is the practice of that Court to hold all evidence of such corroborative statements inadmissible; but these two cases go further, and hold that this is especially true of statements subsequent in date to the impeaching statement; and the reason given is, that to hold otherwise would enable a witness, knowing the likelihood of his impeachment by proof of contradictory statements, to build up a false corroboration by making to many persons consistent statements. Queener v. Morrow, 41 Tenn., 123, is also cited, but this case is decided upon a different proposition, it therefrom appearing that the consistent statements were made by witnesses while in jail, where they were thrown at the instance of plaintiff, such consistent statements being made to the plaintiff, and being in his favor; and the appellate court rejects them, because tainted by interest and improper influence. State v. Caddy,

15 S. Dak. 167, is also cited, but what is there said relative to the admissibility of subsequent consistent statements, is wholly *dicta,* as the court held said corroborative statements admissible under the circumstances of that case.   State v. Moon, 20 Idaho, 202, is cited The same is likewise not in point, and its utterances bearing upon this question are *dicta.*

We would decline to follow State v. Petty, 21 Kas., 54, and Stirn v. Nelson (Kas.), 70 Pac. 355.   These two cases seem to support appellant's contention.   In the Petty case, a homicide had been committed.   The wife of deceased—one Mrs. Clark—was a witness for the State, and testified that Petty was one of the men who killed her husband.   The accused asked her if some two hours after the homicide she had not told one Tatman that she did not know who killed her husband?   She denied this, and the accused used Tatman as a witness.   He swore that she did so state to him some two hours after Mr. Clark was killed.   Thereupon, the State put on the stand one Guffey, who said that about one hour after the homicide, Mrs. Clark told him that the accused was one of the men who killed her husband; the State also put on the stand three other witnesses, who testified that on the evening of the same day, Mrs. Clark told them that the accused was one of the men who slew her husband.   The appellate court held Guffey's testimony admissible, because he said the consistent statement was made to him an hour before Tatman claimed the impeaching statement to have been made to him; but rejected the testimony of the three witnesses to whom consistent statements were made later on the same day, because of the fact that they were made subsequent to the time fixed by Tatman.   We are unable to follow a holding that seems so to grasp at the shadow and reject the substance, and that seems also to be based on the acceptance by the court of. the fact that Tatman told the truth, and that Mrs. Clark was thereby shown to have falsified.   The question involved in every case like this is the truth of the present narrative given by the witness on the instant trial.   As affecting this question, the court permits the opposing party to show inconsistent statements made by the witness at other times, and in such case many jurisdictions, our own among them, allow the witness so attacked to be supported by testimony of consistent statements. Many of the authorities seek to confine the time of such consistent statements to a period near the time of the occurrence involved, but we are unable to grasp the force of this position in those cases where the attack is not based on the approach to the witness of some corruptive influence, but is based on the hypothesis that the witness is one reckless of the truth, and by reason thereof, has made statements contradictory to the one given in evidence.   We think the question of time only material as affecting the weight of the testimony, this being for the jury.   It is evident that there can be no time limit placed on the attacking statement, and that it is permissible to prove against a witness that he made contradictory statements at any time or place prior

to his utterance on the witness-stand in the instant case. It is also true that the greater the number of such contradictory statements, the more forcible the assault on said witness. If the rule be adopted at all, that consistent statements are provable, it seems impossible to fix any arbitrary limit of time to the admissibility of such statements, and especially does it seem to us a misconception of the whole question, to allow the impeaching party to fix a date upon which he states the impeachment statement was made, and to then refuse to allow the introduction of any supporting statement subsequent in date to the one fixed in such impeachment. As stated, the question involved is the present truthfulness of the witness, and to permit the attacking party to select any date from the time of the occurrence testified to, down to the moment of testifying, as his point of attack, and to refuse the attacked witness the privilege of covering any time in the defense subsequent to the date fixed by the attack, is to give a weight to the attack; a credit to the impeaching testimony, for which there is neither reason nor logic. Mr. Tatman swears that Mrs. Clark told him two hours after the death of her husband that she did not know who killed him. She swears that she did not tell Mr. Tatman this. Hence, there arises this conflict between Mrs. Clark and Mr. Tatman. The State then offers to prove that subsequently, and on the same day, Mrs. Clark told other people that Petty killed her husband, and this is rejected. There is no reason for such holding. In the case of the State v. Hendricks, 32 Kas., 559, the opinion in the Petty case was modified, and in said Hendricks case, the appellate court says: ''Such corroborating evidence is not limited to those statements made by the witness before the time when his statements, given in evidence to impeach him, were made, but may be extended to other statements made by him afterward.''

Appellant also cites State v. Fontenot, 19 So., 114; Davis v. Graham, 29 Pac., 1007 (Col.); Adams v. Thornton, 82 Ala., 260. In none of these cases is the point necessarily involved. Ry. Co. v. Sullivan, 190 S. W. Rep., 745, is also cited; this being a case in which the Court of Civil Appeals at Ft. Worth held that a witness attacked by proof of contradictory statements made at the first trial of the case, could not be sustained by proof of consistent statements made on a second trial of the case. As authority for its holding, said opinion quotes 40 Cyc., 2787, which states that corroborative consistent statements are inadmissible. It also cites Ry. Co. v. Eastman, 95 Texas; this being a case in which a prior consistent statement was rejected because self-serving. Neither of these authorities cited in the Sullivan case supports a holding which attempts to differentiate between the admissibility of a consistent statement made before, and one made after the date of the impeachment offered. Nor does the reasoning of the court in that case help the matter. It is a well settled but wholly different rule from the one under discussion, that where a witness is attacked by some effort to show that a motive or corruptive influence has arisen

since the occurrence testified about, which causes him to give the instant testimony, this gives the right to the party whose witness is thus attacked, to show that before the cause for such motive existed, or the corruptive influence approached such witness, his statement or testimony was the same as that given on the instant trial. In his reasoning in the Sullivan case, the learned judge, confuses the issue by basing his decision upon this question of motive, and upon the further fact that the witness was in the employ of the plaintiff, and to that extent his declarations were affected.

We do not find anything in the cases of Keith v. State, 44 S. W. Rep., 849, Scott v. State, 47 S. W. R., 531; Anderson v. State, 50 Texas Crim. Rep., 134; 95 S. W. Rep., 1037; Rice v. State, 50 Texas Crim. Rep., 648, 100 S. W. Rep., 771, which are of legitimate weight in deciding this question. The Scott case, *supra,* does use some expressions which might be considered by one desiring such interpretation. as favorable to appellant's contention, but they are wholly *dicta,* as the effort in that case was by proof of consistent statements to sustain one who was attacked upon the ground that he had been to the penitentiary, and it is apparent that any effort to support by proving consistent statements prior or subsequent, would not be allowed in such case.

Reviewing all the decisions of the various jurisdictions, which seem to hold that supporting statements made after the date of the proposed impeaching statement, are inadmissible, we find that the only reasoning worthy of consideration or discussion, offered in support of such holding, is that such subsequent consistent statements would encourage the witness to make numerous statements of that character, after making the contradictory statement from which he might expect impeachment. To our minds, this reasoning is fallacious. It presupposes the fact that the witness sought to be impeached, made the contradictory statement; and also imputes to the witness not only knowledge and recollection of the fact that he has made such contradictory statements, but also of the further fact that the opposing party will find it out and bring forward such contradictory matter against him, should he ever become a witness none of which are sound. In our opinion, however, the holding that such subsequent contradictory statements are inadmissible is wrong, for the fundamental reason that the question is one wholly relating to the credibility of the witness and this is for the jury, and not for the court; and the latter should not undertake to make a rule of evidence, the only reason or excuse for which seems to be, that if the imaginary condition arose, in which a witness undertook to support himself against an attack by making numerous consistent statements, and proving them, the jury would be unable to say that they were manufactured, and would be misled. We do not understand that the court has any right to so invade the province of the jury.

If, however, for the sake of argument, we should endeavor to apply the fallacious reasoning offered for such holding to the testimony of the witness Morris in the instant case, it would fail of application. Conceding that Morris had made statements on the two impeaching occasions testified to, which were contradictory of his instant testimony, could it be claimed with any show of reason that his testimony given on the first trial in November, 1916, was in any sense a statement made by said witness for the purpose of manufacturing supporting evidence for himself, to meet impeachment? Clearly not so, for as far as the record discloses, when Morris testified in November, 1916, on the first trial of this appellant, he was making what would ordinarily be supposed his last and final statement of the matters, and not only this, but it is shown clearly by the record that each of the other statements made by this witness relative to this matter, was under circumstances where the same was reasonably required. How, then, could the reasoning of the rule sought to be invoked apply to his testimony? We are in agreement with the holding in the case of State v. White, and the case of State v. Hendricks; Brookbank v. State; Hudson v. State, supra, and hold that supporting consistent statements are not confined to those made prior to the day fixed by the impeaching witness or witnesses, but that such support may be by subsequent consistent statements also.

It is also again urged that the mother of appellant, when a witness in the instant trial, should not have been asked as to her knowledge when giving testimony on his *habeas corpus* trial, of the contention then being made by the State that her son was wearing shoes on the day of the homicide. In addition to what was said on this point in the original opinion, we now observe that said interrogation was proper, as a predicate leading up to the question as to what she did say on said *habeas corpus* hearing, as to whether he wore boots or shoes, or whether she was asked such question. It nowhere appears in appellant's bill of exceptions No. 11, that said witness was not in fact asked, and answered on the *habeas corpus* hearing, as to what her son wore on his feet on the day of the homicide. It is stated in said bill that appellant objected at the time on the ground that she had not been so asked, but we have always held that the statement of his ground of objections in his bill does not amount to any statement of the matter as a fact. We are not informed by said bill of exceptions whether appellant's mother was asked on the *habeas corpus* trial as to whether he wore boots or shoes, nor what her answer was at that time, and hence, in any event, such bill would not disclose error.

We think the matters complained of in bills of exception Nos. 3 and 4, wherein it appears that the court rejected evidence of the fact that there were other people in the neighborhood who were on bad terms with deceased, and with whom he had had trouble, were fully discussed and properly disposed of in the original opinion.

We have given much attention to the questions raised here, and especially that respecting the testimony of the witness Morris, because it does not seem to have been fully discussed in this State before, and have been much aided by the exhaustive brief and argument of the attorneys for appellant, but find ourselves unable to agree with the contentions made. The motion for rehearing is overruled.

*Overruled.*