Roy Wayne CRINER, Appellant,

v.

The STATE of Texas, Appellee.

No. 09–90–096 CR.

Court of Appeals of Texas, Beaumont.

Sept. 18, 1991.

Discretionary Review Granted Jan. 8, 1992.

Ray Bass, Austin, for appellant.

Peter Speers, III, Dist. Atty., Kathleen Hamilton, Asst. Dist. Atty., Conroe, for State.

Before WALKER, C.J., and BROOKSHIRE and BURGESS, JJ.

## OPINION

WALKER, Chief Justice.

This is an appeal from a conviction for the felony offense of Aggravated Sexual Assault. The trial began on April 16, 1990 and on May 1, 1990 the jury found appellant guilty. The jury then assessed punishment at ninety-nine (99) years confinement in the Institutional Division of the Texas Department of Criminal Justice, and assessed a fine of $10,000.00. Appellant's brief sets out two points of error. They are as follows:

The evidence is insufficient to sustain appellant's conviction because it fails to establish the corpus delicti of the offense alleged in the indictment.

The evidence is insufficient to sustain appellant's conviction because a rational jury could not have found beyond a reasonable doubt that appellant committed the offense.

We initially address appellant's second point of error as our discussion and analysis of this point will be dispositive of the case.

The indictment charged that the appellant:

... intentionally and knowingly by threats, force and violence, cause the penetration of the female sexual organ of Deanna Ogg, a person not the spouse of the Defendant, by means of an object to-wit: the sexual organ of the defendant, without the consent of Deanna Ogg, and in the course of the same criminal episode, the Defendant caused serious bodily injury to Deanna Ogg by striking the said Deanna Ogg in the head with a blunt instrument the nature of which is unknown to the Grand Jury;
....

The application paragraph in the trial court's charge to the jury recited the identical language contained in the indictment. The jury found the appellant guilty of the offense "as charged in the indictment."

We note at the outset that the State's brief contends that appellant did not preserve the sufficiency complaints for appeal as the appellant's objections and various motions at trial did not specifically comport with what appellant now raises as insufficient. See, Tex.R.App.P. 52(a). In examining the statement of facts, we find that the appellant did indeed preserve the sufficiency point for appellate purposes. We find that this specifically occurred during appellant's oral motion for instructed verdict immediately prior to beginning the case for the defense. See, Gonzalez v. State, 588 S.W.2d 574, footnote 1 at 575 (Tex.Crim.App.1979); Scott v. State, 534

S.W.2d 711 (Tex.Crim.App.1976). Having disposed of this procedural point, we give detailed review to the facts presented to the jury, continuously bearing in mind that the indictment against appellant is for the offense of Aggravated Sexual Assault and not Murder.

On September 27, 1986 at approximately 7:20 p.m., the nude body of the victim, Deanna Ogg, was discovered by two teenage boys. The body was found in a heavily wooded area of Montgomery County approximately two and one-half miles from the intersection of Old Houston Road and FM 1485, and approximately eight miles from the victim's residence. Deanna Ogg was sixteen years old at the time of her death. She was discovered lying face down on a logging trail seventy-five to one hundred yards from Old Houston Road. Blood was all around her head and shoulders and several articles of her clothing were scattered all around her as was the contents of her purse. The purse itself was never located.

Testimony from the Harris County medical examiner revealed that Ms. Ogg died from a fractured skull due to blunt trauma to the head, and from multiple stab wounds to the neck. The neck wounds could have been made by a screwdriver among other things. There was no testimony as to what possible instrumentalities could have been responsible for the skull fracture. Further tests done on the body revealed that Ms. Ogg had sexual intercourse either recently before or after her death with a male individual as the presence of sperm was found on both vaginal and rectal smears. There was no evidence of trauma to the vaginal area and the medical examiner was unable to render an opinion as to whether the sexual intercourse was consensual or not. Toxicology tests revealed that Ms. Ogg had no drugs or alcohol present in her body at the time of her death.

The State elicited testimony from a former Montgomery County Sheriff's Deputy, Charles Self, who testified that he was involved with seizing a brown flat-bed truck with dual rear wheels belonging to appellant's employer, Jesse Pitts, on Sep-

tember 30, 1986. The truck was seized with consent of the owner. Deputy Self further testified that upon looking inside of the truck, he observed a small screwdriver sticking in an air conditioning vent on the dash board. Deputy Self testified that he remembered the screwdriver to have been a flat-head type, not a Phillips-head. Deputy Self also testified that as far as he knew the screwdriver was never checked or subjected to any analysis. The defense later called Texas Ranger Stan Oldham to testify to the fact that his written report included information he had received from the Montgomery County Sheriff's Department stating that the screwdriver found in the truck was a Phillips-head type. Ranger Oldham also testified that he had no idea what was done, if anything, with the screwdriver. In examining the list of exhibits in the instant case we are amazed to find the screwdriver was not mentioned.

Maurita Howarth, a forensic serologist with the Texas Department of Public Safety, testified as to scientific analyses she conducted on blood, semen, and hair samples taken from both the victim's body and the appellant. Ms. Howarth was supplied with known samples of hair (head and pubic) from both Ms. Ogg and appellant. Ms. Howarth was also supplied with unknown hair taken from combing of the victim's pubic hair and other unknown hair taken off of the victim's body as well as unknown hair taken from the brown truck that appellant was operating on the day of the incident. The results of the various comparisons showed that all of the hair found inside the truck did not match the victim's; that from the pubic hair combing of the victim, none of the hair matched appellant's and, in fact, our reading of Ms. Howarth's testimony seems to indicate that she was unable to match one of the unknown pubic hairs to either the victim or appellant. Ms. Howarth further testified that the blood and semen tests were equally inconclusive as to identifying appellant as the assailant.

Testimony from Ms. Ogg's family established that Ms. Ogg had planned to attend a dance that Saturday, September 27, 1986, with her grandmother and her uncle. Ms. Ogg's grandmother and uncle lived in a

mobile home about thirty minutes away from Ms. Ogg's home. When Ms. Ogg's mother was unable to drive her to her grandmother's home, Ms. Ogg left her home on foot.

Testimony from Virginia Mathes, a clerk at the "Stop N Go" convenience store located at the intersection of FM 1314 and Sorter's Road in Porter, Texas, established that Ms. Ogg came into the store and purchased cigarettes sometime between 5:30 p.m. and 7:00 p.m. on September 27. Ms. Mathes did not see how Ms. Ogg arrived but Ms. Mathes did testify that Ms. Ogg stated that she was with some friends and was going to a party in Conroe. From the state of the record before us, Ms. Mathes was the last person to see Ms. Ogg alive other than the person responsible for her death.

The State's case was based entirely upon the above recited facts and eyewitness testimony and on extrajudicial statements allegedly made by the appellant to three other witnesses: Terry Dale Hooker, Michael Ringo, and Jeffrey Pitts. In essence, the State's case against appellant critically hinged on tying the alleged statement to the facts already in existence in order to prove that appellant was the person guilty of the aggravated sexual assault of Deanna Ogg.

As in every criminal case where sufficiency of the evidence is raised, the standard for reviewing the evidence is whether viewing the evidence in the light most favorable to the verdict, any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Butler v. State*, 769 S.W.2d 234 (Tex.Crim.App.1989); *Jackson v. State*, 672 S.W.2d 801 (Tex.Crim.App.1984). The standard is applicable to both direct and circumstantial evidence cases. *Chambers v. State*, 711 S.W.2d 240 (Tex.Crim.App.1986). A conviction based on circumstantial evidence cannot be sustained, however, if the circumstances do not exclude every other reasonable hypothesis except that of the defendant's guilt. *Butler, supra* at 238. If, after viewing the evidence in the light most favorable to the jury's verdict, there is a reasonable hypothesis other than the guilt of the accused, then it cannot be said that the guilt has been shown beyond a reasonable doubt. *Martin v. State*, 753 S.W.2d 384 (Tex.Crim.App.1988). As the instant case is a classic example of a conviction based upon circumstantial evidence, the *Chambers/Martin/Butler* line of cases are particularly pertinent to our analysis of the evidence before the jury.

As mentioned earlier, the State's case against the appellant hinged on the extrajudicial statements allegedly made by appellant to Hooker, Ringo, and Pitts. Hooker and Ringo both testified that on the evening of September 27 they were both at Hooker's house working on vehicles. Ringo testified that between 10:00 p.m. and 11:00 p.m. that night appellant drove up. Ringo further testified that appellant stated that he (appellant) had done something real bad, but that it had turned out all right; that he (appellant) had picked up a girl hitchhiking off of North Park and that the girl was drunk; that appellant did not describe the girl; that his (appellant's) first thoughts after picking up the girl was to have sex with her; that he (appellant) drove behind Kidd Road located behind New Caney School District and at this point the girl got scared and started crying; that he (appellant) pulled the girl down in the seat by the hair of the head. At this point, Ringo testified that he walked away from appellant and Hooker in disgust, and then returned less than a minute later. When Ringo returned, he testified that he heard the appellant say, "I'm going to kill you," with appellant making some sort of motion with his hand. Ringo testified that the, "I'm going to kill you," was part of appellant's story about the girl. Ringo testified that he believed appellant's story. Ringo testified that he and appellant went to grade school together and that he has known appellant for approximately eleven years. Ringo further testified that appellant did not give any date or time-frame as to when these events with the girl took place; nor did appellant say that he (appellant) had non-consensual sex with anyone; nor did appellant say that he (appellant)

actually killed or caused serious bodily injury to anyone.

The State then called Terry Hooker to the stand. Hooker testified that he had known the appellant for about eight years. Hooker testified that when appellant first arrived at Hooker's house appellant looked as if he had just gotten off of work as appellant was dirty and greasy. Hooker then testified that appellant stated that he (appellant) had done something bad, but it turned out all right; that he (appellant) had gone to a store in New Caney and had seen a girl having an argument with some friends of hers and then the girl took off walking and that is when appellant picked the girl up; that the girl was walking down FM 1485 East; that he (appellant) drove around behind a school in New Caney and then went to "Pitts' land;" that when they got to Pitts' land, he (appellant) made the girl perform oral sex on appellant; that he (appellant) grabbed a screwdriver off the dash board or out of the glove compartment and told the girl that if she tried to get away or make any noises he (appellant) would kill her; that he (appellant) then took the girl to Humble, Texas and kicked her out of the truck. Hooker testified that appellant did not describe how the girl acted. Hooker further testified that appellant did not describe the girl or anything about her, but recalled that appellant stated the girl was from "Porter, New Caney." Hooker also testified that he did believe the appellant's story. On cross-examination, Hooker testified that he was sure appellant said the girl was walking on FM 1485 East and not on North Park Drive, and that appellant said that the events with the girl took place on *Friday* night which would have been September 26. Hooker testified that appellant used the words "the night before." Hooker further admitted that appellant did not say that he (appellant) had non-consensual sex with anyone nor did appellant say that he (appellant) ever killed anyone. Hooker also testified that during appellant's account of the events with the girl, appellant did not make any jabbing motions with the screwdriver, nor did appellant even use the phrase, "I'm going to kill you."

The next witness for the State was Jeffrey Pitts. Appellant had been employed by the Pitts family logging business during the time when the offense occurred. Jeffrey Pitts was twenty-three years old at the time of trial and had taken over as head of the family's logging business. The Pitts family owned a great deal of land in Montgomery County and the land was heavily forested. Jeffrey Pitts testified that he had known appellant since the sixth or seventh grade in school. On direct examination by the State, Pitts testified that on September 27, 1986, he and appellant and appellant's brother, Richard, were working at a logging site and that Pitts and Richard Criner arrived at about 10:00 a.m. or 10:30 a.m. that morning. Appellant arrived later. Pitts testified that he and Richard left the work area in the woods at about 3:00 p.m. or 4:00 p.m. that afternoon in order to get a replacement part for a bulldozer. Appellant stayed behind at the logging site. Appellant had access to and regularly operated a company vehicle described as a brown one-ton, flat-bed truck with dual rear wheels. This is the same vehicle that both Ringo and Hooker described appellant driving when he arrived at Hooker's house on the evening of September 27. Pitts further testified that he and Richard Criner arrived back at the logging site at about 7:30 p.m. or 8:00 p.m. on September 27 and that appellant was there when they arrived. Pitts testified that he first repaired the bulldozer and then had a conversation with appellant. Pitts testified that appellant stated that he (appellant) had picked up a *blond-haired* girl; that he (appellant) took the girl down the road and threatened her with a screwdriver and had some words; that he (appellant) had gotten the screwdriver from the air-conditioner vent in the truck he was driving; that he (appellant) had *raped* the girl and had left her there when he got through. Pitts testified that when he read an article describing Deanna Ogg's murder, which appeared in the newspaper the following Monday, he spoke to appellant several days later and showed appellant the newspaper. Pitts testified that appellant's response was that he (ap-

pellant) did not do it, and that he (appellant) had picked the girl up and brought her to her grandmother's house, which appellant described as a trailer house in New Caney. Over vigorous defense objections, Pitts was allowed to testify to the fact that a week or two after the murder, appellant told Pitts that he hated women because appellant's mother had left him when he was young.

At the conclusion of the State's direct examination of Pitts, they tendered to appellant's counsel copies of three statements, made at various times to authorities, by Jeffrey Pitts. Two of the statements were handwritten statements by Pitts himself, and the other was a transcribed copy of Pitts' sworn grand jury testimony. These were used to thoroughly impeach Pitts' direct examination testimony. The essence of Pitts' sworn grand jury testimony was that appellant was in Pitts' presence at the logging camp from approximately 10:00 a.m. or 11:00 a.m. until 10:00 p.m. on September 27, 1986; that appellant recounted the story the evening of September 27 so the incident with the girl must have occurred sometime late Friday, September 26, 1986 at around 2:00 a.m. or 3:00 a.m. in the morning; that appellant talked about picking up a girl, but appellant did not say the girl was blond-haired nor did appellant describe the girl's appearance at all; that appellant did say the girl was about twenty years old, but that it was dark in the truck. Then the following exchange took place between Pitts and appellant's trial counsel as trial counsel was going over Pitts' grand jury testimony line by line:

Q. Question: "Okay. What about the grandmother's house?" Do you recall that question from Mr. Walker?

A. Yes, sir.

Q. Do you recall your response that you made?

A. No, sir.

Q. Do you recall saying, and let me go slow because it's a lengthy one. "What he told me is that he was driving through New Caney. There was a bunch of guys arguing at a station and they looked

pretty drunk, he said. He said he went through the underpass and there was a girl walking. He said she was pretty drunk or messed up and whatnot." Did you make that response?

A. Yes, sir.

Q. Was that true when you made it?

A. Yes, sir.

Q. "He said I stopped and asked her if she wanted a ride and she got in and I carried her down the road. And she said she wanted to go to her grandmother's."

A. Yes, sir.

Q. "She was supposed to go to her grandmother's house and instead they went down the road and had sex and whatnot. He didn't say nothing; like I told the Texas Ranger."

A. Yes, sir.

Q. "He didn't say he raped the girl or nothing to me."

A. Yes, sir.

Q. Did you make that response?

A. Yes, sir.

Q. Was it true when you made it?

A. Yes, sir.

Q. "All he told me was he just carried her down the road and had sex with her and I made a crack and said, 'What did you pick her up and carry her home?', and he said, no, I left her there. I said all right, like that, and we kind of dropped the subject. And that was before y'all come and picked up my dually and fingerprinted it."

Did you make that response—

A. Yes, sir.

Q. —to the Grand Jury and to Mr. Walker under oath?

A. Yes, sir.

Q. And was it true when you made it?

A. Yes, sir.

The record reflects that the serious impeachment of Pitts continued for several more pages. On re-direct examination, the State attempted rehabilitation by reiterating Pitts' previous trial testimony of the more incriminating version of appellant's story to Pitts. As to any explanation why his sworn grand jury testimony and a written statement made two months later were

so different Pitts responded essentially with the excuse that a spoken rendition of events was a much different experience from a written rendition of events, and that, "Just, it's been four years ago. It's hard for me to remember everything." (sic).

The offense of Aggravated Sexual Assault includes within it the offense of Sexual Assault. *Perryman v. State,* 798 S.W.2d 326 (Tex.App.—Dallas 1990, no pet.); *McGahey v. State,* 744 S.W.2d 695 (Tex.App.—Fort Worth 1988, pet. ref'd). TEX.PENAL CODE ANN. § 22.021 (Vernon 1989) provides what amounts to five additional elements, any one of which turns what would otherwise be a Sexual Assault into an *Aggravated* Sexual Assault. This list is in subsection (a)(2) and classifies a sexual assault as aggravated if the State pleads and proves that the perpetrator:

(i) causes serious bodily injury or attempts to cause the death of the victim or another person in the course of the same criminal episode;

(ii) by acts or words places the victim in fear that death, serious bodily injury, or kidnapping will be imminently inflicted on any person;

(iii) by acts or words occurring in the presence of the victim threatens to cause the death, serious bodily injury, or kidnapping of any person, or

(iv) uses or exhibits a deadly weapon in the course of the same criminal episode; or

(B) the victim is younger than 14 years of age.

■ In the instant case, after a very exhaustive examination of the record before us, we are unable to find any evidence that appellant caused serious bodily injury to Deanna Ogg "by striking the said Deanna Ogg in the head with a blunt instrument ...," as charged in the indictment, and as provided to the jury in the trial court's charge. This is most significant as the *Benson–Boozer* line of cases provide us with the authority under these circumstances. *Benson v. State,* 661 S.W.2d 708 (Tex.Crim.App.1982), *cert. denied* 467 U.S. 1219, 104 S.Ct. 2667, 81 L.Ed.2d 372 (1984);

*Boozer v. State,* 717 S.W.2d 608 (Tex.Crim. App.1984). These cases hold that the sufficiency of the evidence must be measured against the jury charge, even if the instruction is erroneous—and the State has not objected to increasing its burden of proof. *See, Saunders v. State,* 794 S.W.2d 91, 92 (Tex.App.—San Antonio 1990, pet. granted); *Husting v. State,* 790 S.W.2d 121, 125 (Tex.App.—San Antonio 1990, no pet.).

In the instant case, in each of the renditions of the extrajudicial statement allegedly made by appellant, where is any language even reasonably related to appellant having struck or beaten "the girl" that he picked up hitchhiking, in the head or anywhere else on her body? We hold that no trier of fact, rational or otherwise, could have culled from any of the evidence presented the essential aggravating element of Aggravated Sexual Assault; that being that appellant caused serious bodily injury to the victim by striking her with some unknown blunt instrument. Where was any evidence from the medical examiner or any other witness as to how the victim could have sustained such an injury, or, more importantly, how the appellant caused or could have caused the head injury to the victim? In short, there was no evidence for a rational trier of fact to latch onto in order to find that the aggravating element of the offense had indeed been proven *beyond a reasonable doubt. Jackson v. Virginia, supra; Butler, supra.* Furthermore, testing the sufficiency of the evidence against the charge given, and applying the standards of review enunciated above leads us to the identical conclusion that no rational trier of fact could have found beyond a reasonable doubt *all* of the essential elements of the offense charged. Appellant's second point of error is sustained.

In view of our disposition of the second point of error, we need not reach appellant's other contention. Because the evidence is insufficient, the conviction must be set aside and an acquittal ordered. *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); *Greene v. Massey,* 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978).

The judgment is reversed and the appellant is ordered acquitted.

REVERSED AND ACQUITTED.

BROOKSHIRE, Justice, dissenting.

Hornbook law teaches that an intermediate appellate court must review and view all of the evidence and the inferences and the reasonable inferences therefrom in a light that is most favorable to the jury's verdict. Axiomatic also is the concept that the jury is the exclusive judge or judges of the credibility of the witnesses and the weight to be given the testimony of the witnesses. The jury's prerogatives in this regard under Texas practice are broad and virtually plenary. The jury can believe all of one witness' testimony. The jury can disbelieve all of a witness' testimony. The Texas jury is also empowered to believe part of a witness' testimony and disbelieve another part of the same witness' testimony. A long accepted rule of importance in this appeal is that when cases involve circumstantial evidence each fact that is shown or demonstrated need not point directly and independently to the guilt of the defendant. The cumulative and overall effect of all of the circumstantial evidence and all the incriminating facts may well be sufficient to sustain the verdict and the conviction and even the individual, necessary elements of the crime or the offense may be proved by circumstantial evidence, by direct evidence, or by some circumstantial and some direct evidence. The essential elements of the offense are sometimes referred to by the Latin phrase "corpus delicti". Circumstantial evidence can prove the offense beyond a reasonable doubt.

If there is some evidence that corroborates a confession or statement, then the confession or statement, if admissible, may itself be used in the establishment of the corpus delicti of the crime or of the offense. The state advances and argues that a rational trier or finder of facts could have found the element of lack of consent on the part of the victim herein beyond a reasonable doubt to the sexual assault and to the aggravated sexual assault. I agree. In briefest, thumbnail sketch, the state argues that the testimony of one Michael Ringo shows and demonstrates a lack of consent, as does the testimony of one Terry Hooker. Also, some of the testimony of one Jeff Pitts demonstrates a lack of consent. Again, I agree.

The state, of course, further advances and maintains that a rational trier of fact could have found beyond a reasonable doubt, in addition to the lack of consent, that the appellant here inflicted serious bodily injury on the deceased victim, one Deanna Ogg, during the same criminal episode during which the sexual assault occurred. As a concomitant and parallel proposition, the state argues that certainly under these brutal facts, that any rational trier of fact could have found easily beyond a reasonable doubt that the appellant caused the serious bodily injuries to Ogg by striking her on or in the head with a blunt instrument. Ogg died.

The state also argues that a rational trier of fact could have found beyond a reasonable doubt that the unnamed victim (that is to say, the actual name of the victim was not used in the appellant's admissions); nevertheless, these same appellant's admissions have identified and determined that the victim was one Deanna Ogg. The state's arguments and position take the following tact: that the description of the young girl in the appellant's admission matches the description of the dead victim Ogg; the description of the area in which the appellant admits that he picked up the girl corresponds to the area in which Ogg's corpse was found; that the appellant's admission that he raped the girl matches the findings ascertained by the medical examiner that Ogg had sexual intercourse; that the time frame in which the appellant admits that he sexually assaulted the young girl matches the time frame or time limits in which Ogg was missing; that importantly, the appellant's admission that he, himself, had threatened the young girl with a screwdriver that was on or connected with the air-conditioning vent of his truck was logically supported and sustained by the finding of a screwdriver that was positioned in or hanging in the air-conditioning

vent of the truck having been used by appellant on the date in question.

The record reflects clearly that Miss Ogg died on September 27, 1986. She was sixteen years of age. She was in the ninth grade at the New Caney School of the New Caney Independent School District. The mother of the victim testified. She identified State's Exhibit No. 2. It was a photograph of her daughter, the deceased Deanna. The mother testified that the photograph truly and accurately represented and showed how Deanna looked. It was a school picture. It came in without objection. The school picture depicts a young girl with blond or blondish hair. The photograph was taken three days prior to her death. The mother's name was Patricia Ogg. Deanna had made plans to attend a dance with her maternal grandmother, Mrs. McCoy, along with her uncle, a Michael McCoy. Deanna spent a good deal of time at her maternal grandmother's house. Patricia Ogg described her daughter as having at times a strong temper. Deanna could act like a "wildcat".

The state called to the witness stand one Virginia A. Mathes. She had resided in Texas before 1987. Mathes had lived in Porter in the White Oak Apartments for about a year. Mathes had worked at the Stop–N–Go. The Stop–N–Go was located at Farm to Market Road 1314 and Sorter's Road. This location was in Porter, Texas. Virginia Mathes recognized Deanna Ogg and she recognized the victim through State's Exhibit No. 2 which was a school photograph of the victim as referred to above. Deanna Ogg was a customer at the Stop–N–Go. Deanna came in this convenience store about three times a week. Mathes recognized this person also by name and recognized the name as being Deanna Ogg. Mathes recalled seeing Deanna in the store on September 27, 1986. She definitely recalled the incident. Mathes was busy. Deanna had to wait in line to be served. Deanna seemed to have a happy-go-lucky attitude. Deanna was in the Stop–N–Go at sometime between 5:30 p.m. but not later than 7:00 p.m. in the early evening. Deanna was buying a particular type of cigarettes. Virginia Mathes remembered the transaction because Mathes had told Deanna that cigarettes were not supposed to be sold to her. Deanna said that the cigarettes were for a friend, so the transaction was completed. Deanna said at that time that she was going to a party. The cigarette transaction took place while it was still light and sunny outside of the store. Mathes' best recollection was that the cigarettes were a pack of Marlborough Lights. Mathes had given this information to certain detectives about two days after the transaction. Mathes had had a conversation with two male detectives. Mathes gave a further explanation as to why she remembered the cigarettes were Marlborough Lights. The reason was that Deanna was twisting these cigarettes in her hands while Deanna was waiting for Mathes to complete the transaction. Deanna seemed to be playing with this pack of cigarettes.

The victim, Deanna, had started for her grandmother's house to then go to a party or a dance. Her uncle was to accompany the grandmother and the victim. In fact, Deanna, the victim, had spoken with her uncle Michael some time around 11:00 a.m. on September 27, 1986. It was after the conversation with the uncle that Deanna went to the Stop–N–Go store to obtain the Marlborough Lights.

About two hours later, or slightly more, there were two fourteen year-old boys who were riding their bikes. These bikes were described as 4–wheelers. They were riding near a logging trail which departed off of an Old Houston Road. These two fourteen year-old boys were identified as Kyle Carrigan and Charley Cantrell. Kyle Carrigan's uncle actually owned some land in Montgomery County in September of 1986, and the boys were riding on the property owned by Kyle's uncle. Kyle was familiar with the Old Houston Road. In the early evening hours of Saturday, the 27th, Carrigan and Cantrell were riding on some trails. The sun was just beginning to set. The two boys discovered the body of a girl. Kyle had his headlights on his 4–wheeler lit up. Kyle turned his headlights down to see the object on the ground in a better

light. Kyle went back to a road. Kyle met a lady on the road. He then went to his own father's place and he persuaded his father to follow him (Kyle) back to where the body was located. Kyle stayed on the black-topped road but he gave detailed directions to his father as to the location of the body of the young girl. In the meantime, the lady had gone to call the police. A peace officer showed up. He was a deputy sheriff. This deputy arrived about 10 or 15 minutes later. The discovery of the body of the young girl took place around 7:15 p.m.

Michael Ringo testified that he knew the appellant, Roy Wayne Criner, since about the eighth grade in school. Ringo was about fourteen years of age at that time. Ringo also knew Terry Dale Hooker. Hooker testified that he also knew the appellant Criner. Ringo definitely remembered seeing appellant Criner on the particular evening of September 27, 1986. Criner was driving a maroon Chevrolet pick-up truck, one ton, with a flat bed attached to it. The truck was further described as a "dually" pick-up truck with dual wheels on the rear. It was a work truck and there were tools on it. Ringo knew that the truck actually belonged to a family known as the Pitts family. He knew where the Pitts family lived. The Pitts family was engaged in the logging business.

Criner drove up at about 10:00 p.m. on September 27. Criner came up to Ringo and also to Terry. The location was at Terry's house. A somewhat lengthy conversation ensued. Roy Criner spoke first. The first thing Criner said was that he (Criner) had done something real bad. Ringo testified that this "real bad something" had occurred earlier that same day according to Criner. The statements made by Criner took place, probably between 10:00 p.m. and 11:00 p.m. September 27, 1986. The next thing the appellant said was that he (Criner) picked up "this girl hitchhiking". Criner then stated (according to Ringo) that the first thing Criner thought was that he (Criner) was going to have sex with the girl. Ringo testified that those were the exact words used and spoken by Criner. Criner also stated that he got her in the

truck and that he was going to have sex with her. Criner turned down behind the Kidd Road which was behind a place described as the New Caney School District. Criner stated the girl was scared and started crying. Criner said that he pulled the girl down in the seat by the hair of her head.

Ringo then became disgusted when Criner described pulling the girl down in the seat by the hair of her head and Ringo walked away momentarily. But shortly thereafter Ringo walked back to where Criner was. Ringo had left Criner's immediate presence for something less than a minute or so. Upon Ringo's return, he heard Criner say that he was going to kill the girl and then Criner made a motion with his hands. Criner was still telling about the same story and the same episode of events. Ringo was about 21 or 22 years of age at trial date. Ringo said that Criner was not laughing and was not joking. Because of Criner's demeanor, Ringo believed that what Criner had said was the truth. Ringo testified that Criner had very strong physical strength. Ringo had told this same narrative to a law enforcement officer with the colorful name of Hoot Gibson. Hoot Gibson was a Montgomery County deputy.

Terry Hooker testified to a narrative of events that was about the same as the narration given by Ringo. Basically, Criner told Terry Hooker that Criner went to a store in New Caney, picked up a girl, and drove around to the back of a school, and then drove on to some land owned by the Pitts family.

On cross-examination, Ringo also testified that Criner had said that "it turned out all right". But that was an ambiguous statement and it was for the jury to weigh. Importantly, the word "it" was not elaborated upon. It was within the jury's well-established prerogative to look upon this as a defense building type of statement or a statement that was in the nature of a self-justifying statement, as well as being actually self-serving. The jury evidently discredited this statement. The jury could have believed that "it turned out all right"

meant for the purposes of Criner—but definitely not "all right" for Ogg, the dead victim. Criner had also stated that the girl was drunk. Even under vigorous cross-examination Ringo repeated that Roy Criner had said the words "I'm going to kill you"—directed toward Ogg. These death words were directed towards the girl that had been hitchhiking. Query: Was it not within the jury's power and prerogative to weigh this evidence and to determine that what was meant was that the sex turned out all right for Criner? Query: But not for Deanna Ogg?

On redirect, Ringo again testified that Criner had basically said that he (Criner) would kill the girl and that Criner had described the killing with a motion of his hand as a jabbing motion. This testimony was also put in a statement that had been previously made by Ringo before trial. This evidence was not a recent fabrication. And the jury could so determine.

Terry Dale Hooker was called to the stand by the state. He was, at the time of trial, a resident of Cleveland, Texas. He was married. He knew Mike Ringo. They had known each other for about twelve years. They were friends. Hooker knew Roy Criner for about seven or eight years. In September of 1986, Terry Hooker was living with his parents in Porter. Terry Hooker remembered the evening of September 27, 1986. He was at his parents' home working on his truck. It was about 9:00 p.m. or sometime thereafter. Mike Ringo was with him. While Terry and Ringo were together, Criner drove up in a work truck, being a company truck. The truck was a brown, dually, flat-bed truck. A dually truck meant it possessed dual wheels on the rear of the truck. It was a one-ton truck. The truck belonged to the Pitts family.

Both Ringo and Terry knew a young man who was a member of the Pitts family. The young man was named Jeff Pitts. In September of 1986, Roy Criner was working for the Pitts family doing logging work. Criner got out of the dually one-ton flat-bed truck. He appeared somewhat dirty and greasy. A somewhat lengthy conversation ensued. Criner initiated the conversation. Terry Hooker stated that Criner said that he (Criner) had done something bad, but it turned out all right. Again, the word "it" was not elaborated on and this language was not clear as to what the word "it" actually referred to. The queries above are asked again. Terry Hooker, in his sworn testimony before the jury, stated in substance that Criner said that he (Criner) went to a store in New Caney and picked up a young girl. Criner made additional incriminating statements and confessions.

Under this record the jury was also well within its established prerogatives to believe and give full credence to the statement of the appellant made to the girl that "I'm going to kill you". The appellant had previously observed a young girl having an argument with some friends of hers and then she took off walking. At that point Criner picked her up. Terry Hooker testified Criner said that they then drove down and went on to the Pitts' land. I find in the record that Terry Hooker testified as follows:

Q. All right. What else did Mr. Criner say? What did he say next?

A. Well, when they got to Pitts' land, he made her perform some oral sex.

Q. Prior to getting to that location, did Mr. Criner describe anything else that happened in the truck?

A. Yes, sir. He said he grabbed a screwdriver off the dash or out of the glove compartment. I don't really remember that.

Q. He said he grabbed a screwdriver. What did he do with the screwdriver, if he said?

A. *He told her, you know, if she tried to get away or made any noises, he'd kill her.*

Q. Now then, when you make this reference to the Pitts' land, is that a specific location or can you explain that to the jury? What does that mean?

A. Well, that's what he said, Pitts' land. I don't really know where he's talking about, because they have a lot of land.

Q. All right. In what area?

**148**

A. Montgomery County, all around Porter.

Q. All right. This land that you're referring to, the Pitts' land, what kind of—how would you describe it?

A. Wooded, you know, thick; good logging land. (Emphasis added)

Significant and important it is to stress that under well-established rules of evidence in Texas and well-established standards of the jury's duties and rights, the jury can believe part of a witness' testimony and disbelieve other parts of the same witness' testimony. Criner had stated that the girl came from Porter or New Caney. Terry thought that the statements were "kind of perverted". But, nevertheless, Terry believed what Criner had said. Terry had given a prior, written statement to a law enforcement official, which statement was consistent with his in-court testimony.

Jeff Pitts, a 23-year old, also took the stand. He testified that Criner was working with him on his family's logging operation in the fall of 1986. Pitts had known Criner since the sixth or seventh grade. Pitts described the work truck which the appellant drove. It was a brown, flat-bed, one-ton dually Chevrolet truck. Pitts gave further testimony. The testimony was that on September 27, 1986, Criner had told him (Pitts) that he had picked up a blond-haired girl and had taken her down the road and had threatened her with a screwdriver; that he had raped her and then that he had left her in the road when he got through. Jeff Pitts described in detail the location of his family's logging operation in Montgomery County. It was in the vicinity of Porter, known as the Porter area. The logging operation was in the vicinity of Farm to Market Road 1314. The Old Houston Road intersected with Farm to Market Road 1314. The Pitts family owned about 300 acres at this location. The working men went into the Pitts land from off of Sorter's Road. Pitts recognized and identified the location of Farm to Market Road 1314 on State's Exhibit No. 3 which was a partial map of Montgomery County described as a Key Map. Pitts also identified the location of Farm to Market Road 1485. He also recognized and identified United States Highway 59 on the Montgomery County map. Pitts identified on the map where the logging operations were being conducted. Criner, the defendant, was working with Pitts in that area and at the logging operations. Pitts also identified on the map Sorter's Road. He located the same. It was also known as the Sorter's–McClellan Road.

Crucially and importantly, Pitts' testimony in part is this:

Q. You may answer the question. After you finished work on the dozer, did you have an occasion to have a conversation, then, with Roy Criner?

A. Yes.

Q. All right. What's the first thing that he told you?

A. I'd asked him what did he do, you know, that night. And he said, picked up a girl.

Q. All right. Did he say or did he give any indication—did he give any indication as to what the girl looked like? Did he describe her appearance in any way?

A. He said he had picked up a blond-haired girl.

Q. Okay. What did he tell you after that?

A. He took her down the road and had threatened her with a screwdriver and had some words.

Q. Okay. Took her down the road and threatened her with a screwdriver?

A. Right.

Q. Did he tell, indicate to you where he had got the screwdriver?

A. He said it was on the air-conditioner vent.

Q. Of the truck he was in?

A. Right.

Q. After he told you about that threatening her with a screwdriver, what else did he say?

A. They had sex.

Q. All right. Did he indicate to you, in any way—how did he describe that? What did he tell you about having sex?

A. They stopped and had sex and he had left her there when he got through.

Q. What word did he use when he told you that he had sex with her?

A. He had raped her.

A medical doctor, being a medical examiner, testified that the victim died as a result of a fracture to her skull due to a blunt trauma to her head, and to multiple stab wounds to her neck. These multiple stab wounds to her neck consisted of about eleven puncture wounds. The doctor testifying was named Dr. Parungao. This doctor testified that, in his opinion, a screwdriver could have caused the puncture wounds. Dr. Parungao had served as an assistant medical examiner for a period of more than nine years. It was part of his official duties and functions to conduct autopsies. The performance of autopsies was one of his major functions. Through this expert medical examiner there was introduced into evidence State's Exhibit No. 9 which was the autopsy on the body of Deanna Ogg, including an attached toxicology report. There was no objection to this report and the same was admitted into evidence. The primary purpose of an autopsy is, of course, according to the doctor, to determine the cause of death. The cause of death was set out as a result of a fracture to the skull due to a blunt trauma to the head and also to multiple stab wounds of the neck. There were also multiple contusions. According to the autopsy report, Deanna Ogg was a Caucasian female. She was found dead about 7:42 p.m. on September 27, 1986, on an old logging road. The scalp was covered with blond hair. There were multiple contusions about the left ear, and posterior auricular area. The irises were hazel. There was a contusion in the mid-portion of the upper lip. The laboratory results demonstrated that no alcohol was found in the deceased's body. There was a negative result to a drug screening test, both as to bile and blood. No opiates were present. Dr. Parungao testified as follows:

Q. Dr. Parungao, on State's Exhibit No. 6, what is that a picture of?

A. That is the neck. That's showing the hemorrhage around the neck.

Q. All right. In Dr. Jordan's autopsy, did he list as one of the causes of death the puncture wounds or stab wounds to the neck?

A. Yes, sir.

Q. All right. That cause of death would apparently have resulted or been the result of the hemorrhage?

A. That's correct.

A certain amount of spermatozoa was found in Deanna's vagina and also in her rectum. There is evidence from the medical examiner that prior to her death, or just prior to her death or at the time of her death, sexual intercourse had been engaged in. The sexual intercourse was with a male person. The doctor further testified that there was a penetration of Miss Ogg's vagina by a male penis or a male sexual organ. The doctor explained how he determined this fact. The doctor further explained:

Q. Thank you, Doctor. Now then, Dr. Parungao, I believe the report indicates that there was spermatozoa in the anus, or rectum, as well; is that correct?

A. That's correct.

Q. Can you say with any kind of certainty exactly how that spermatozoa and acid phosphate got into the rectum?

A. Two things. That a sodomy was performed or whatever, or the male organ inserted in the anus and ejaculated there or the one in the vagina could have run to the anus.

Q. All right. In other words, if there was only sexual intercourse involving the penetration of the vagina, it's possible that those fluids could have run down into the rectal area.

A. That's correct.

A forensic serologist, Maurita Howarth testified. She was employed by the Texas Department of Public Safety. She had specialized in forensic serology for almost six years. She had a Bachelor's degree in chemistry. This serologist received a semen sample, a blood sample, a pubic hair sample, a fingernail scraping, a pulled hair sample, and oral smear samples, all of which were obtained from Roy Criner. Howarth testified that she determined the blood type of Criner to be blood type O.

She also determined that Criner was a secretor. Hence, she would expect to find certain blood group substances in Criner's seminal fluid. She would expect to find the same thing in quantities of the appellant's saliva. Howarth was able to analyze a rectal swab. She found a blood group substance on that rectal swab. The blood group substance was H. The rectal swab was taken from Deanna Ogg. The serologist testified that as to blood type O, the person will secrete blood group substance H, which was found in the rectal swab from the rectum of Ogg. This is ascertainable if the person involved is a secretor. Criner was a secretor. And blood type O, Howarth swore, gives the blood group substance H only. The record recites this:

Q. All right. What about blood Type O?

A. They will secrete blood group substance H.

Q. All right. Now, once again, the blood group substances will be found in body fluids, if you will, for people who are secretors only; is that right?

A. That's correct.

Q. All right. And blood Type O gives the blood group substance H only.

A. That's correct.

Q. All right. Now then, in the rectal swab that you analyzed that came from the body of Deanna Ogg, what blood group substance did you find?

A. I found blood group substance H.

Q. All right. Now then, if the defendant, Roy Criner's blood type is O, as you've testified, and if he is a secretor, as you've testified, is it consistent, then, that from a body fluid that he left someplace, that you would find the blood group substance H?

A. Yes, it is.

. . . .

Q. All right. If, however, the blood group substance H is found by itself, that eliminating that other possibility, what blood type and secretor status does that indicate?

A. It indicates an O secretor.

Q. All right. And Roy Criner is an O secretor?

A. Yes, he is.

There was, of course, much other evidence in this lengthy record which included numerous exhibits. The Ninth Court of Appeals is to consider the evidence, the exhibits, and the testimony in the light that is most favorable to the jury's verdict. At this level of appeal it is proper to review the sufficiency of the evidence in the light most favorable to the judgment and prosecution and not in the light of a presumption of innocence. Criner is not here presumed innocent. See *Templin v. State*, 711 S.W.2d 30 (Tex.Crim.App.1986). After viewing and analyzing the record in the light that is most favorable to the jury's verdict, and at this level of appeal—without a presumption existing here of innocence; then the inquiry must be made by this Court to the effect that could any rational trier of fact found the essential elements of the indicted offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Cordova v. State*, 698 S.W.2d 107 (Tex.Crim.App.1985); *Bonham v. State*, 680 S.W.2d 815 (Tex.Crim.App.1985); *Lopez v. State*, 630 S.W.2d 936 (Tex.Crim.App.1982). I conclude that a rational trier of fact could have found the essential elements of the crime of aggravated sexual assault beyond a reasonable doubt.

In my opinion, the testimony of the witnesses, as set out above, demonstrates such a valid finding of guilt beyond a reasonable doubt by a rational trier of fact. The jury so believed and so found in this case. It is trite, but it is a compelling truism that the jury in Texas may accept or reject any or all of the testimony of any one of the witnesses. See *Madrid v. State*, 595 S.W.2d 106 (Tex.Crim.App.1979). And, of course, the jury is well within its prerogative to resolve any inconsistencies or conflicts in the evidence. *Jackson v. State*, 672 S.W.2d 801 (Tex.Crim.App.1984). The weight to be given the evidence is a sovereign function of the trial jury. The statements—indeed, the confessions—made by Criner to Ringo, Hooker and Pitts, along with the physical evidence, coupled with the testimony of the medical examiner and

the serologist constitute evidence and testimony of ample probative force and evaluation to sustain the verdict of the jury. This conclusion is reinforced by the exhibits. Simply put, the jury was well within its powers, rights and prerogatives to find and determine that the appellant raped the young girl against her will and forced her to have oral sex as well and that her death was brought about by a blunt trauma to her head and also by piercing, penetrating stab wounds to the neck of young Ogg. A jury could certainly determine and find that the screwdriver was and could have been used to inflict the serious injuries to Ogg's neck under the evidence in this case as well as under the incriminating statements and confessions made by the appellant. Unquestionably, the jury could have properly found all of the essential elements of the offense of aggravated sexual assault.

The record contains both direct and circumstantial, relevant, probative evidence. As to the circumstantial evidence phase of the record, it is well established that each fact does not necessarily have to point directly and independently to the guilt of the defendant. The proper criteria is the cumulative effect or effects of all of the incriminating, surrounding facts. It is the cumulative effect of the entirety of the circumstantial evidence, the direct evidence, the exhibits and the physical facts that establishes the sufficiency of the evidence to support the verdict of the jury and the conviction of the appellant. Indeed, the entire record before us must be carefully examined because of the way the appellant attacks his conviction.

And, of course, it is well settled that the standard for reviewing the sufficiency of the evidence on appeal is the same for a direct evidence case as it is for a circumstantial evidence case. However, here, I opine, that there is both direct and circumstantial evidence, as well as demonstrative evidence. See *Houston v. State*, 663 S.W.2d 455 (Tex.Crim.App.1984); *Carlsen v. State*, 654 S.W.2d 444 (Tex.Crim.App. 1983) (Opinion on Rehearing); *Freeman v. State*, 654 S.W.2d 450 (Tex.Crim.App.1983) (Opinion on Rehearing); and *Denby v. State*, 654 S.W.2d 457 (Tex.Crim.App.1983)

(Opinion on Rehearing). Well established also is the rule that in purely circumstantial evidence cases the burden upon the prosecution is to present evidence that excludes every other reasonable hypothesis other than the defendant's guilt. But the state need not present evidence that excludes every possible or every conceivable hypothesis except that of the defendant's guilt. See *Hooker v. State*, 621 S.W.2d 597 (Tex.Crim.App.1980).

The essential elements or essential parts of the indictment against Criner are: he did intentionally and knowingly by threats, force and violence, cause the penetration of the female sexual organ of Deanna Ogg, a person not his spouse, by means of the sexual organ of the defendant, namely, Roy Wayne Criner, without the consent of Deanna; and in the course of the same criminal episode the defendant caused serious bodily injury to Deanna Ogg by striking Ogg in the head with a blunt instrument, the nature of which is unknown and was unknown to the grand jury. The record before us sustains all of these essential allegations and elements.

*Again, the statements which are confessions made by the appellant himself, coupled with the testimony of Ringo, Hooker, Pitts, the medical examiner, and the serologist buttressed by the physical or direct evidence in the case reinforced by the exhibits admitted in the case clearly sustain the verdict of the jury.* Criner was not in custodial interrogation when he made his confessions to Ringo, Hooker and Pitts. These friends were not officers of the law. Criner's confessions were blurted out in a purely voluntary manner. Appellant said he raped Deanna, he said he told her that he would kill her. Deanna was identified by her recent picture and other strong evidence. She had puncture marks on her neck. The medical examiner said the screwdriver was a likely instrument to inflict such injuries. Ogg was dead; she had bruises on her head.

The appellant stated to Jeff Pitts that he picked up a blond-haired girl—Deanna Ogg was a blond-haired girl (observe her photograph taken only three days before her

death)—and that he threatened her with a screwdriver, that different types of sex were engaged in and that Criner left Ogg on the logging road or logging trail or very near thereby after the sexual acts of various natures were finally concluded. Clearly, under this record, a rational trier of fact could have found beyond reasonable doubt (as did the trial jury) that the appellant, from both the direct evidence, the exhibits, and the circumstantial evidence, inflicted serious bodily injury on Deanna, the 16 year-old dead girl. And a finder of facts could reasonably conclude that this serious bodily injury occurred during the same criminal episode in which Criner sexually assaulted Ogg against her will and without her consent.

In brief, the jury could and did properly put two and two together and come up with the correct four. The record reflects that the various types of sexual intercourse and sexual activities and the serious bodily injuries were certainly related closely in time. The autopsy report itself, which was admitted into evidence without any objection, was cogent, compelling, probative evidence for the jurors to weigh and consider. This autopsy report supported the element that Deanna suffered a blunt trauma to her head. The autopsy report reflects that a cause of death was the result of a fracture to the skull which, in turn, was due to a blunt trauma to the head, as well as multiple stab wounds to the neck. The jurors could have reasonably found and determined—as, indeed, they did—that the same causes of Deanna's death were also the causes of serious bodily injury to her. Furthermore, in my opinion, any rational trier of fact could have found beyond a reasonable doubt that the unnamed victim, that is to say, the victim unnamed in appellant's statements and confessions to three different lay-people, was, in fact, Deanna Ogg. This finding is buttressed by the fact that the description of the girl in the appellant's admissions and confessions matches the description of the victim and the graduation photograph. The dead body found in this case was Deanna Ogg.

The jury could have rightly determined and concluded that when the appellant made certain sexual advances towards and against Deanna that her temper flared and that she became very angry and fought back which resulted in her serious bodily injuries that eventually caused her death. After all, the record clearly reflects that Criner, the appellant, admitted and confessed before Terry Hooker and Michael Ringo that he had sex on his mind from the very first when he picked the young girl up. In another conversation at a different time with Jeff Pitts, the appellant stated and confessed that he (Criner) raped the dead victim—and he used that word—and that he would and could kill if Ogg resisted. The record shows that Criner's dead victim was Deanna. If Deanna's temper flared, she could have become a "wildcat". The jury could have properly considered and weighed all that evidence. The jury should have done so. The term "wildcat" was used by Patricia Ogg, the mother, to describe her own daughter Deanna. The mother's sworn oath is cloaked with strong probative force. Mothers usually know well their daughters. Hence, the jury could, well within its prerogative, find the sexual intercourse and the other sexual activities were all non-consensual from the standpoint of Deanna. The appellant also told Ringo that he actually reached over and grabbed the victim by her hair and pulled her down in the seat. Query: Where is the consent? This was a repulsive statement to Ringo. In addition, Ringo testified that the appellant, while narrating the horrific events of what he (appellant) had done, had said "I'm going to kill you." These words, of course, were directed to Deanna and at the same time the appellant made a jabbing motion with his hand.

The appellant's *mens rea* or his state of mind was clearly bent on having immediate sexual intercourse accompanied by and coupled with inflicting serious bodily injury. Again, Terry Hooker gave testimony about the appellant grabbing a screwdriver—a rather long screwdriver—from some part of the dashboard of the truck at which time the appellant told the victim that if she tried to get away or make any noises, that

he would kill her. Again, where is the consent?

*Jeff Pitts testified that the appellant told him that he (appellant) took the victim down the road and threatened her with a screwdriver.* The sexual intercourse and the serious bodily injuries were definitely related in time. This fact was scientifically supported by the evidence given by Dr. V. Parungao. This same medical examiner testified that the serious bodily injuries to Deanna were caused by striking her on or in the head with a blunt instrument. As stated above, Deanna also received a number of piercing injuries to her neck and in her neck area. Again, the medical examiner said this could have been caused by a long screwdriver. When carefully reading and reviewing the complete autopsy report which came into evidence without objection, the fact-finders could have properly determined that the same cause of Deanna's death were the identical causes of the serious bodily injuries sustained by her.

Furthermore, the record clearly demonstrates that the area in which the appellant admits he picked up the girl matches the area in which Ogg's body was found and that the appellant's statements and confessions that he raped the girl definitely are harmonious with the findings of the medical examiner that sexual intercourse had been completed on Ogg; that the time frame in which the appellant admits that he picked up and sexually assaulted the young girl is consistent with the time frame in which Ogg was missing; that the appellant's admission that he threatened the girl with a screwdriver that was at or near an air-conditioning vent of his truck is supported by the physical evidence; and lastly, that the description of the girl in the appellant's statement matches the description of the victim, Ogg, and matches her physical characteristics such as her blond hair. Analyzing the appellant's second point of error, the jury's verdict, sentence, and judgment below should be affirmed. The majority opinion acquits the appellant solely on the basis of his second point of error. Point of Error Two (2) is, itself, clearly erroneous. The same grossly misstates

the law as well as the standard of appellate review. Appellant's Point of Error Two (2) is fatally flawed. Yet the Court disposes of the case and this appeal solely on this lethally defective, inadequate ground.

Since the majority under this horrendous record orders an acquittal of the appellant, I must respectfully lodge this dissent.

A former requirement that the circumstantial evidence exclude every other reasonable hypothesis except that of the defendant's guilt is now no longer the ultimate, paramount, standard of review. Rather, the *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), test or criteria is that of any rational trier of fact. The "any rational trier of fact" appraisal is now the standard. Nevertheless, if in using the "any rational trier of fact" analysis, the evidence supports a reasonable hypothesis (being in the record, of course) other than the guilt of the defendant, then the appellate court is not permitted to rule that such a verdict of guilt is a truly rational finding by a rational trier of fact. *Freeman v. State,* 654 S.W.2d 450 (Tex.Crim.App.1983). Even so, this standard or test is satisfied if the conclusion and verdict of guilt is warranted by a combined and cumulative force of all of the incriminating circumstances. I cannot hold that under all of the incriminating circumstances that there exists a reasonable hypothesis that the indicted offense has been committed by some third person other than the accused Criner. The hypothesis embraced by the majority that this offense may have been committed by some other individual, I maintain, is out of harmony with the evidence. See *Jones v. State,* 442 S.W.2d 698 (Tex.Crim.App.1969), *cert. denied,* 397 U.S. 958, 90 S.Ct. 967, 25 L.Ed.2d 143 (1970). Simply put, the unaccounted-for hypothesis to the effect that a third person committed the offense must be a reasonable hypothesis consistent with all of the surrounding circumstances and facts that were proved in the record. I maintain that no such reasonable hypothesis exists before us. Such saving (to the appellant), reasonable, unaccounted for hypothesis should be demonstrated by the record; but it is not. The concept and rule (of that

which is required) to constitute proof beyond a reasonable doubt must be tested and analyzed in each case on the individual facts of each case. I would hold that the record clearly proves that the offense was actually committed and that there was the necessary degree of proof and evidence to show that the accused was the person who committed the indicted offense. *O'Mary v. State*, 139 Tex.Crim. 294, 139 S.W.2d 800 (1940); *Slaughter v. State*, 132 Tex.Crim. 179, 103 S.W.2d 385 (1937); *Taylor v. State*, 87 Tex.Crim. 330, 221 S.W. 611 (1919).

At times and under certain fact situations, seemingly insignificant circumstances and the totality of surrounding events provide very satisfactory, sustaining evidence of the guilt of the accused. *Mitchell v. State*, 650 S.W.2d 801 (Tex. Crim.App.1983), *cert. denied* 464 U.S. 1073, 104 S.Ct. 985, 79 L.Ed.2d 221, *reh. denied* 465 U.S. 1074, 104 S.Ct. 1431, 79 L.Ed.2d 755 (1984); *Mumphrey v. State*, 774 S.W.2d 75 (Tex.App.—Beaumont 1989) *pet. ref'd* 780 S.W.2d 259 (Tex.Crim.App.1989).

I perceive that this record and the evidence contained therein meets all of the requisite criteria for sustaining the verdict of guilt of this accused. I would vote to affirm. Since the Court declines to affirm but acquit, I respectfully file this dissent.